No. 25-7035

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JOHN REVELL, individually, on behalf of all others similarly situated, and on behalf of the general public,

*Plaintiff-Appellee*,

v.

GRANT MONEY, LLC, a Delaware corporation doing business as Grant; KIKOFF, INC., a Delaware corporation,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-5994-TLT (Hon. Trina Thompson)

## APPELLANTS' OPENING BRIEF

Matthew P. Previn
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
(212) 318-6000

Michael Morrill
PAUL HASTINGS LLP
71 S. Wacker Drive
Chicago, IL  60606
(312) 499-6000

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellants Grant Money, LLC and Kikoff Inc. make the following disclosures:

Grant Money, LLC is a subsidiary of Kikoff Inc. and Kikoff Holdco Inc. Neither Kikoff Inc. nor Kikoff Holdco Inc. is publicly traded. No publicly traded company holds 10% or more of the stock of Kikoff Inc. or Kikoff Holdco Inc.

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ............................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 3

STATEMENT OF THE ISSUES ......................................................................... 4

STATEMENT OF THE CASE ............................................................................ 5

    A.    Legal Background ......................................................................... 5

    B.    Factual Background ....................................................................... 8

    C.    Procedural History ...................................................................... 11

    D.    The CFPB's Advisory Opinion .................................................. 13

SUMMARY OF THE ARGUMENT ................................................................. 15

STANDARD OF REVIEW ............................................................................... 18

ARGUMENT ..................................................................................................... 18

I.    Because the MLA Bars Only Mandatory Arbitration Agreements, It Does Not Apply Here. ............................................................................... 18

II.    Because Defendants' EWA Product Does Not Extend "Credit," the MLA Does Not Apply. ............................................................................. 23

    A.    Because Plaintiff Had No Obligation to Repay, No "Debt"—and Therefore No "Credit"—Was Created. ...................................... 24

    B.    The District Court Erred by Holding That Defendants' EWA Products Constituted An Extension of Credit. ................................ 29

III.    The MLA Does Not Apply Because Defendants Do Not Impose "Finance Charges." ........................................................................................ 34

IV.    Because TILA and the GPLA Impose No Ban on Arbitration Agreements, Plaintiff's Claims Under Those Statutes Should Be Sent to Arbitration. ........................................................................................ 40

CONCLUSION .................................................................................................. 43

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998)..............................................................................21, 22

*Asgrow Seed Co. v. Winterboer*,
513 U.S. 179 (1995).....................................................................................24

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................................................................................5, 6

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*,
566 U.S. 399 (2012).....................................................................................29

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012).......................................................................................43

*Corley v. United States*,
556 U.S. 303 (2009).....................................................................................21

*Davis v. Nordstrom, Inc.*,
755 F.3d 1089 (9th Cir. 2014) ..................................................................6, 40

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)............................................................................6, 16, 41

*Ford Motor Credit Co. v. Milhollin*,
444 U.S. 555 (1980).....................................................................................33

*Garrett v. Monterey Fin. Servs., LLC*,
No. 18-cv-325, 2018 WL 3579856 (D. Md. July 25, 2018)...............................20

*Gilman v. Comm'r*,
53 F.2d 47 (8th Cir. 1931) ............................................................................27

*Gray v. Conseco, Inc.*,
No. SA CV 00-322DOC(EEX), 2000 WL 1480273
(C.D. Cal. Sept. 29, 2000)..............................................................................42

*Holley-Gallegly v. TA Operating, LLC*,
74 F.4th 997 (9th Cir. 2023) .........................................................................18

*Jones v. Gen. Motors Corp.*,
640 F. Supp. 2d 1124 (D. Ariz. 2009) .............................................................42

iii

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)................................................................6, 18, 41

*Orubo v. Activehours, Inc.*,
780 F. Supp. 3d 927 (N.D. Cal. 2025)..............................12, 29, 31, 38

*Pa. Dep't of Pub. Welfare v. Davenport*,
495 U.S. 552 (1990)........................................................................26

*Perry v. United States*,
294 U.S. 330 (1935)........................................................................27

*Pollice v. Nat'l Tax Funding, L.P.*,
225 F.3d 379 (3d Cir. 2000) ...........................................................26

*Rent-A-Ctr., W., Inc. v. Jackson*,
561 U.S. 63 (2010)............................................................................5

*Smith v. City of Jackson*,
544 U.S. 228 (2005)........................................................................26

*Stanley v. City of Sanford*,
606 U.S. 46 (2025)..........................................................................31

*Stone v. Mid Am. Bank & Tr. Co.*,
No. 2:18-CV-87-RMP, 2018 WL 4701843 (E.D. Wash. Aug. 31, 2018)..........42

*Thompson v. Comm'r*,
235 F.2d 599 (9th Cir. 1956) .....................................................26, 27

*Veale v. Citibank, F.S.B.*,
85 F.3d 577 (11th Cir. 1996) ..........................................................37

**STATUTES**

9 U.S.C. § 1 .......................................................................................5

9 U.S.C. § 3 ....................................................................................4, 5

9 U.S.C. § 4 ....................................................................................4, 5

9 U.S.C. § 16.....................................................................................4

10 U.S.C. § 987........................................................................*passim*

11 U.S.C. § 101................................................................................26

12 U.S.C. § 5512..............................................................................36

15 U.S.C. § 1601........................................................................3, 7, 33

15 U.S.C. § 1638................................................................................8

iv

15 U.S.C. § 1692 ..................................................................................25

15 U.S.C. § 1692a ................................................................................25

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1367 ....................................................................................3

Pub. L. No. 90-321, 82 Stat. 146 (1968).............................................7

Ark. Code § 23-52-203 ........................................................................28

Ga. Code. Ann. § 16-17-1 ......................................................................3

Ga. Code Ann. § 16-17-2 ..................................................................8, 41

Ind. Code § 28-8-6-1002 .....................................................................28

Kan. Stat. § 9-2407 ..............................................................................28

La. Stat. § 9:3591.5 ..............................................................................28

Mo. Stat. § 361.749.6 ...........................................................................28

Nev. Rev. Stat. § 604D.190 ..................................................................28

S.C. Code § 39-5-860 ...........................................................................28

Utah Code § 13-78-106 .........................................................................28

**REGULATIONS**

12 C.F.R. pt. 1026, Supp. I ..............................................................25, 30

12 C.F.R. § 1026.2 ...............................................................................25

12 C.F.R. § 1026.4 ...........................................................2, 7, 17, 35, 38

12 C.F.R. § 1026.17 ...........................................................................8, 25

12 C.F.R. § 1026.18 ..............................................................................8

32 C.F.R. § 232.3 ...........................................................7, 16, 23, 24, 25, 34

75 Fed. Reg. 57252 (Sept. 20, 2010) ...................................................36

90 Fed. Reg. 60069 (Dec. 23, 2025)..............................................*passim*

*Limitations on Terms of Consumer Credit Extended to Service
Members and Dependents*, 80 Fed. Reg. 43560 (July 22, 2015)..................31, 32

*Limitations on Terms of Consumer Credit Extended to Service
Members and Dependents*, 72 Fed. Reg. 18157 (Apr. 11, 2007) ......................31

v

OTHER AUTHORITIES

CFPB, Payactiv Approval Order, at 5 (Dec. 30, 2020),
 https://files.consumerfinance.gov/f/documents/cfpb_payactiv_
 approval-order_2020-12.pdf ................................................................39

*Condition*, Black's Law Dictionary (12th ed. 2024) ................................................35

*Debt*, Black's Law Dictionary (12th ed. 2024)................................................24

*Debt*, Merriam-Webster Online, https://perma.cc/CHT7-MP8W
 (last accessed Jan. 17, 2026)................................................................24

*Impose*, Merriam-Webster Online, https://perma.cc/M87Q-X9GZ
 (last access Jan. 25, 2026)................................................................35

*Incident*, Black's Law Dictionary (12th ed. 2024) ................................................35

*Mobile Check Deposit*, PNC, https://perma.cc/7HSY-L7W8
 (last accessed Jan. 19, 2026)................................................................38

*Penalty*, Merriam-Webster Online, https://www.merriam-
 webster.com/dictionary/penalty (last accessed Feb. 25, 2026) ........................22

*Remedy*, Merriam-Webster Online, https://www.merriam-
 webster.com/dictionary/remedy (last accessed Feb. 25, 2026) ........................22

*Standard Bank Transfers FAQ*, Venmo, https://perma.cc/39XT-EVAN
 (last accessed Jan. 16, 2026)................................................................39

## INTRODUCTION

Earned Wage Access, or EWA, is a financial product that provides non-recourse cash advances to customers, giving them needed liquidity prior to the receipt of their paychecks. Defendants[1] are financial technology companies that offer EWA through their mobile app. At issue on appeal is whether federal lending laws such as the Military Lending Act ("MLA") and Truth in Lending Act ("TILA") apply to Defendants' EWA product.

Plaintiff John Revell, an active-duty serviceman residing in Georgia, is a user of Defendants' EWA product who agreed to Defendants' terms of service, including its provision to resolve any disputes by arbitration. Despite this agreement, Plaintiff pursued a putative class action in federal court asserting claims that Defendants' EWA product violates the MLA, TILA, and the Georgia Payday Loan Act ("GPLA"). In opposing enforcement of the arbitration agreement, Plaintiff argued that the MLA applies to Defendants' product and prohibits arbitration of all his claims. The district court agreed and denied Defendants' motion to stay the individual claims in favor of arbitration and strike the class claims, a decision that Defendants now appeal.

The district court's decision was wrong for several reasons.

---

[1] Defendant Grant Money, LLC, which offers the EWA product at issue, is a wholly owned subsidiary of co-Defendant Kikoff Inc. ER-121.

*First*, the district court misread the MLA to hold that *voluntary* agreements to arbitrate MLA claims are unenforceable, when the statute bars only *mandatory* arbitration agreements. The court's holding to the contrary ignores the careful and deliberate manner in which Congress structured the MLA, and it therefore warrants reversal.

*Second*, the district court erroneously held that Defendants' product involves the extension of "credit." Under the MLA, whether a product involves the extension of "credit" depends on whether it creates a "debt," which is a legal or contractual obligation to repay money. Because Defendants' terms of service expressly disclaimed any contractual or legal right to recover any cash advances made to Plaintiff, however, the advances did not create a "debt" and accordingly did not involve the extension of "credit."

*Third*, the district court erred in holding that Defendants' product imposed a "finance charge" on Plaintiff—another necessary element to trigger application of the MLA. The court found that the optional expedited delivery fee Plaintiff paid to receive the cash advance more quickly qualified as a "finance charge." But under the MLA's implementing regulations, a fee qualifies as a finance charge only where it is "imposed" by the creditor, is "incident to or a condition of the extension of credit," and is not "of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). Because Plaintiff could have obtained a cash advance without paying

2

the expedited delivery fee, the expedited delivery fee is neither "imposed" by Defendants nor "incident to or a condition of the extension of credit." Moreover, expedited delivery fees are routinely charged by banks and other financial services providers in connection with transfers of cash from one account to another and are therefore "of a type payable in a comparable cash transaction."

*Finally*, the district court erred by refusing to require Plaintiff to arbitrate his TILA and GPLA claims. Even if Plaintiff is correct that the MLA bars arbitration of Plaintiff's claim brought under that statute, neither TILA nor the GPLA contains a similar provision barring arbitration agreements. Because the Federal Arbitration Act ("FAA") imposes a strong presumption in favor of arbitration, the district court should, at a minimum, have required Plaintiff to arbitrate his TILA and GPLA claims.

For any or all of these reasons, this Court should reverse the decision below and remand with instructions to order arbitration of Plaintiff's claims.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's federal claims under the MLA, 10 U.S.C. § 987, and TILA, 15 U.S.C. § 1601 *et seq.* The court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's state-law claims under the GPLA, Ga. Code. Ann. § 16-

3

17-1 *et seq.*, because they form part of the same case or controversy as Plaintiff's federal claims.

On October 22, 2025, the district court released a minute entry denying Defendants' motion to stay Plaintiff's individual claims in favor of arbitration and to strike Plaintiff's class claims under 9 U.S.C. §§ 3 and 4. ER-176. On November 5, 2025, Defendants timely filed a notice of appeal. ER-166-168. Hours later, the district court released an opinion supporting its ruling. ER-3-26. In an abundance of caution, Defendants filed a second notice of appeal on November 7, 2025, seeking review of the court's November 5 opinion. ER-163-165.

This Court has jurisdiction under 9 U.S.C. § 16, which authorizes appeals from orders "refusing a stay of any action under section 3" or "denying a petition under section 4 of this title to order arbitration to proceed." 9 U.S.C. § 16(a)(1)(A)-(B).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in determining that the MLA precludes enforcement of a *voluntary* agreement to arbitrate Plaintiff's claims under the MLA, even though Section 987(e)(3) of the MLA prohibits only *mandatory* arbitration agreements.

2.     Whether the district court erred in holding that Defendants' cash advances to Plaintiff created "debt" and therefore qualified as "credit" under the

MLA, despite Plaintiff having been under no legal or contractual obligation to repay the advanced funds.

3.      Whether the district court erred in holding that Defendants' optional expedited delivery fee constitutes a "finance charge" under the applicable regulations, even though it relates only to a voluntary bonus feature and users can obtain the same cash advances over a longer period of time without paying the fee.

4.      Whether the district court erred in refusing to send Plaintiff's TILA and GPLA claims to arbitration, despite the fact that neither TILA nor the GPLA contains a provision barring arbitration agreements and the FAA imposes a strong presumption in favor of arbitration.

## STATEMENT OF THE CASE

### A.      Legal Background

#### 1.      The Federal Arbitration Act

Congress enacted the FAA, 9 U.S.C. § 1 *et seq.*, to curb "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The "overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.* at 344. Under the FAA, a federal court "*shall* . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement," and "*shall*" compel the parties into arbitration. 9 U.S.C. §§ 3–4 (emphases added); *see Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). The

FAA therefore "reflects a 'liberal federal policy' in favor of arbitration." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014) (quoting *Concepcion*, 563 U.S. at 339). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Thus, a party seeking to preclude enforcement of an arbitration agreement "faces a stout uphill climb" and must "bear[] the heavy burden of showing . . . a clear and manifest congressional command to displace the Arbitration Act and outlaw agreements like theirs." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510-11 (2018).

## 2. The Military Lending Act

The MLA, 10 U.S.C. § 987, governs the extension of "consumer credit" to active-duty servicemembers and their dependents. With respect to arbitration, the MLA makes it "unlawful for any creditor to extend consumer credit to a covered member . . . with respect to which . . . the creditor requires the borrower to submit to arbitration." 10 U.S.C. § 987(e)(3). As part of its "Penalties and Remedies" provision, the MLA also provides that "[n]otwithstanding [the FAA], no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member." 10 U.S.C. § 987(f)(4).

6

The MLA does not define "consumer credit" and instead delegates that responsibility to the Secretary of Defense. 10 U.S.C. § 987(h)(2)(D), (i)(6). The Secretary of Defense, in turn, has promulgated regulations defining "[c]onsumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) [s]ubject to a finance charge; or (ii) [p]ayable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1). Those regulations also define "[c]redit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). They provide that "[f]inance charge has the same meaning as 'finance charge' in Regulation Z," 32 C.F.R. § 232.3(n)." Regulation Z, for its part, defines "finance charge" as "the cost of consumer credit as a dollar amount," which includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit" but which "does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a).

### 3. The Truth in Lending Act

The purpose of TILA, 15 U.S.C. § 1601 *et seq.*, is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a); *see* Pub. L. No. 90-321, § 102, 82 Stat. 146, 146 (1968). TILA

requires creditors to make certain disclosures in connection with specified credit transactions. *See* 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Unlike the MLA, TILA contains no provisions relating to or restricting the use of arbitration.

### 4. The Georgia Payday Loan Act

The GPLA prohibits "the making of loans of $3,000.00 or less" unless the lender is a bank or otherwise licensed to lend money under a Georgia licensing statute. Ga. Code Ann. § 16-17-2(a). The GPLA includes a provision rendering arbitration agreements in covered loan contracts unenforceable only "if the contract is unconscionable." Ga. Code Ann. § 16-17-2(c)(2).

### B. Factual Background

#### 1. Defendants' Business and the Agreements Governing Plaintiff's Cash Advances

Workers' wages are often paid on a monthly or biweekly basis, meaning that workers receive their wages only *after* they have performed their work. Workers, however, have ongoing expenses, which creates a demand for short-term liquidity to pay for needed goods and services while their pay is tied up in a payroll system. To address that problem, Defendants offer an EWA product through which a customer can access a portion of his or her earned wages through a cash advance (an "Advance") that is made prior to the customer's wages being deposited into the customer's bank account. *See* ER-97. Defendants' EWA product allows customers to obtain necessary goods and services or handle small emergency expenses on their

preferred timeline while avoiding high-priced traditional alternatives like payday loans. Defendants offer advances in amounts that vary from $25 to $250. *Id.*

Plaintiff is an active-duty member of the U.S. Army. ER-29-30. He alleges that he utilized Defendants' EWA product, which Defendants offered through a mobile application at that time called "Oasis," to obtain multiple Advances. ER-48-49. When signing up to use the Oasis application, Plaintiff agreed to certain terms memorialized in a Customer Agreement. ER-69, ER-71; *see* ER-8 ("Plaintiff signed up to use the Oasis application. . . . He accepted Defendants' Terms of Service.").[2]

The Customer Agreement contains several substantive provisions relevant to this appeal. *First*, it expressly informs each customer that the Advances are "non-recourse," that Defendants "ha[ve] no legal or contractual claim against you based on a failure to repay an Advance," and that Defendants "will not engage in any debt collection activities." ER-98-99. Instead, Defendants reserve only "the right to suspend your access to the services until you repay an Advance in full." *Id. Second*, the Customer Agreement explains that customers have the option to cancel "at any time, regardless of whether [they] have an outstanding Advance that has not been repaid" and may "avoid billing for the subsequent statement period" by completing the request to cancel within three business days before the next billing date. ER-

---

[2] Though Plaintiff did not attach the Customer Agreement to his complaint, the district court correctly incorporated the document by reference. ER-9.

109; *see also* ER-100-101. And *third*, the Customer Agreement provides that customers may also obtain access to optional additional services for an extra fee, including an expedited delivery fee (called the "Instant Delivery Fee" in the Customer Agreement) for users who wish to obtain their funds more quickly. That feature is entirely elective and is described as such in the agreement:

> Eligible customers may choose to expedite delivery of an Advance by paying an additional fee (the "Instant Delivery Fee"), which may range from USD $1.00 to USD $8.00, depending on the amount of the requested Advance. Oasis typically delivers the Advance to customers who have paid the Instant Delivery Fee in sixty (60) minutes or less but does not guarantee that delivery will occur within a specific timeframe.

ER-97. Nothing in the Customer Agreement obligated Plaintiff to pay the expedited delivery fee in order to obtain an Advance, which Plaintiff could procure with no repayment obligation whatsoever.

Alongside those substantive provisions, the Customer Agreement also includes a conspicuously disclosed arbitration provision (the "Arbitration Agreement"). *See* ER-98 ("PLEASE READ THESE TERMS OF SERVICE CAREFULLY, AS THEY CONTAIN AN ARBITRATION AGREEMENT."); ER-111-115 (introducing Arbitration Agreement with a bold, underlined heading that reads "DISPUTE RESOLUTION BY BINDING ARBITRATION; JURY TRIAL & CLASS ACTION WAIVER"). The Arbitration Agreement provides that the parties agree to settle their disputes in arbitration, stating:

10

You and we agree that any and all past, present or future disputes, claims or controversies that have arisen or may arise between you and Company, whether arising out of or relating to these Agreements (including any alleged breach thereof), the services, the App, your Account, any advertising or any other aspect of the relationship or transactions between you and us (collectively, "Claims"), shall be resolved by an arbitrator through final and binding arbitration, rather than by a judge or jury in court, in accordance with the terms of this Arbitration Agreement.

ER-111. The Arbitration Agreement also includes, once again in capital letters, a "CLASS ACTION WAIVER," by which "YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS." ER-112. Finally, the Arbitration Agreement includes a "RIGHT TO REJECT." ER-114-115. Under that provision, a customer is free to "reject this Arbitration Agreement" by "send[ing] written notice of [his] rejection within 30 days" after his application is approved. ER-114. Plaintiff did not avail himself of the option to reject the Arbitration Agreement. ER-95.

## C. Procedural History

On June 10, 2025, Plaintiff filed this action against Defendants in the Superior Court of the State of California for the County of San Francisco. ER-129-162. Plaintiff alleges violations of the MLA, TILA, and the GPLA, and seeks to represent a class of individuals for each claim and to bring suit on behalf of the general public. ER-27-60. On July 16, 2025, Defendants timely removed the action to the United

States District Court for the Northern District of California. *See* ER-123-127. On August 8, 2025, Defendants moved to enforce the Arbitration Agreement, strike Plaintiff's class claims, and stay further the proceedings in favor of individual arbitration. *See* ER-61-90.

On November 5, 2025, the district court entered a written opinion denying Defendants' motion. *See* ER-3-26; *see also* ER-176 (October 22, 2025, minute entry denying Defendants' motion and explaining that a written opinion would follow). Relying on a line of district court cases stemming from *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025), the court's analysis proceeded in several steps. *First*, it held that Section 987(f)(4) of the MLA—which is contained within the "Penalties and Remedies" subsection of the statute—prohibits the enforcement of "any" agreement to arbitrate any dispute involving the extension of consumer credit under the MLA. ER-14. The court did so notwithstanding the fact that the MLA's separate "Limitations" provision makes unlawful only "require[d]" arbitration agreements. ER-14-16. *Second*, the court found that Defendants' EWA transactions constituted an extension of "credit" under the MLA's regulations, and therefore fell within the MLA's ambit, even though the Advances did not give rise to any legal repayment obligation. ER-17-19. *Third*, the court held that "though the expedite fees are not expressly mandatory," they nevertheless are "incident to" the extension of credit and therefore are finance charges under the MLA. ER-19-22. *Finally*, the

12

court refused to compel arbitration of Plaintiff's TILA and GPLA claims, holding that "because all of Plaintiff's claims are about the same dispute involving an extension of credit to covered servicemembers, the MLA prohibits compelling arbitration of all of Plaintiff's claims." ER-22-25.

### D.    The CFPB's Advisory Opinion

On December 23, 2025, the Consumer Financial Protection Bureau (the "Bureau" or the "CFPB") issued an Advisory Opinion entitled "Truth in Lending (Regulation Z); Non-application to Earned Wage Access Products." *See* 90 Fed. Reg. 60069 (Dec. 23, 2025) ("Advisory Opinion"). The CFPB explained that it was issuing the Advisory Opinion to "resolve regulatory uncertainty regarding . . . (1) the applicability of the definition of credit under Regulation Z, which implements the Truth in Lending Act (TILA), to earned wage access (EWA) products . . . and (2) the applicability of the definition of finance charge under Regulation Z to certain EWA-related charges (expedited delivery fees, tips) to the extent any EWA products meet the Regulation Z definition of credit." *Id.* at 60069. With respect to both topics, the CFPB expressly rejected the *Orubo* line of decisions treating EWA products as "credit" and deeming expedited delivery fees as finance charges.

In the Advisory Opinion, the CFPB found that EWA products in which providers use "a payroll process deduction in connection with the worker's next payroll event" (which the Advisory Opinion labeled "Covered EWA") are "not

13

credit under Regulation Z." *Id.* at 60071.[3]  The CFPB explained that such a product "does not provide workers with the right to defer payment of debt or to incur debt and defer its payment" and therefore "is not credit."  *Id.*  In so doing, the CFPB looked to the "common meaning of debt," which entails an "obligation owed by one person, the debtor, to another, the creditor."  *Id*. (citation omitted).  The CFPB explained that EWA products resemble the early payment of wages rather than the extension of credit and that "[t]he presence of a third-party intermediary—the EWA provider—facilitating access to accrued earnings does not change the nature of the transaction."  *Id.* at 60073.  Finally, the CFPB added that EWA products lack the "significant indicia that are common in credit transactions," such as "underwriting, debt collection, recourse, credit reporting, and so on."  *Id.*

The CFPB further determined that, "to the extent that any EWA product is Regulation Z credit, expedited delivery fees and tips are not, in the normal course,

---

[3] The CFPB distinguished between two types of EWA products: "employer-partnered" EWA, in which EWA providers contract with employers to offer their workers access to advances and "utilize[] the payroll process to deduct accessed amounts"; and "direct-to-consumer" EWA products, in which EWA providers (like Defendants here) offer access to advances directly to consumers and therefore "generally debit[] accessed amounts" from a consumer's bank account.  90 Fed. Reg. at 60070.  While the section of the Advisory Opinion relating to the applicability of the definition of "credit" ostensibly applies only to "Covered EWA" products— which fall in the former rather than the latter of the two types of EWA products— much of the reasoning behind the Advisory Opinion applies to both.  Regardless, the CFPB stated that "nothing in [the Advisory Opinion] should be understood to state[] that EWA products that are *not* Covered EWA *are* credit under Regulation Z."  *Id.* at 60071.

14

finance charges under Regulation Z." *Id.* at 60071. That determination expressly applies to all "EWA products," not just those using payroll deductions. *Id.* at 60071-60072. In support, the CFPB observed that "expedited delivery fees are the cost of obtaining earned wages more quickly than via ACH, and are triggered by the consumer's opting for expedited delivery; they are not 'directly or indirectly imposed.'" *Id.* at 60075. The CFPB further explained that when consumers "can receive exactly the same service without paying the fee"—for example, via the ordinary, non-expedited use of the product—optional fees for faster delivery are not "imposed" as an incident to or condition of the extension of credit. *Id*.

## SUMMARY OF THE ARGUMENT

The district erred in denying Defendants' motion in four distinct ways.

*First*, the district court erred in holding that the MLA bars enforcement of even *optional* arbitration agreements. Under Section 987(e)(3) of the MLA, only mandatory arbitration agreements are unlawful. *See* 10 U.S.C. § 987(e)(3) ("It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor *requires* the borrower to submit to arbitration." (emphasis added)). Here, however, Plaintiff had the option to reject the Arbitration Agreement within 30 days of signing up for Defendants' EWA product, meaning that the agreement was voluntary, not mandatory, and therefore complied with the MLA's substantive requirements. In

15

nevertheless refusing to enforce the Arbitration Agreement, the district court pointed to a separate provision of the MLA stating that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member." 10 U.S.C. § 987(f)(4). Section 987(f)(4), however, exists within the MLA's "Penalties and Remedies" subsection, and imposes no freestanding limitations on parties' ability to enter into arbitral agreements that comply with Section 987(e)(3)'s substantive requirements. The court, therefore, had no sound basis for refusing to enforce the parties' voluntary (not "require[d]") Arbitration Agreement here, particularly in the absence of "clear and manifest" congressional intent "to displace the Arbitration Act and outlaw agreements" to arbitrate. *Epic Sys.*, 584 U.S. at 510-11.

*Second*, the district court erred in finding that Defendants' EWA transactions constituted "credit" under the MLA. In order to trigger the MLA (and its prohibition of mandatory arbitration), Plaintiff must establish that the transactions in question involved the extension of "credit." The MLA's implementing regulations define "credit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). And while neither the MLA nor its implementing regulations define "debt," the ordinary meaning of that term—as well its definition under closely related federal statutes—refers to a contractual or legal obligation to repay someone, as the CFPB's recent Advisory

16

Opinion confirms. Here, because Plaintiff had no legal obligation to repay the advances under the terms of the Customer Agreement, no "debt" was created and the MLA simply does not apply.

*Third*, the district court wrongly concluded that Defendants' expedited delivery fee—an optional fee assessed for receiving an Advance more quickly than the standard delivery time—is a "finance charge." Under the relevant regulations, a fee qualifies as a finance charge only if it is "imposed directly or indirectly by the creditor," is "incident to or a condition of the extension of credit," and is not "of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). Because the expedited delivery fee is a purely optional bonus feature, it is not "imposed" by Defendants, and nor is it an incident to or a condition of the Advances. Moreover, banks and other financial services providers regularly charge expedited delivery fees in connection with transfers of cash from one account to another, meaning that Defendants' expedited delivery fees are "of a type payable in a comparable cash transaction." *Id*.

*Fourth*, the district court erred in declining to compel arbitration of Plaintiff's TILA and GPLA claims. The MLA's prohibition of mandatory arbitration agreements should be read to apply only to claims brought under the MLA; in the absence of a clear congressional command, the prohibition should not be expanded to reach claims brought under other statutes, like TILA or the GPLA, which do not

17

contain provisions barring arbitration agreements. The court's contrary understanding violated the FAA's strong presumption in favor of arbitration.

For these reasons, this Court should reverse the decision below and remand with instructions to order Plaintiff to arbitrate his individual claims and stay the case while arbitration is pending.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision to grant or deny a motion to compel arbitration." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

## ARGUMENT

The FAA reflects a "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The parties do not dispute that Plaintiff agreed to arbitrate and that his claims fall within the scope of the Arbitration Agreement. The sole question, rather, is whether the MLA forecloses enforcement of the parties' voluntary agreement to arbitrate. The district court's determination that it does was incorrect for four separate reasons.

## I. Because the MLA Bars Only Mandatory Arbitration Agreements, It Does Not Apply Here.

The district court's first error was to misread the MLA to impose a blanket ban on all arbitration agreements, when the proper reading of the statute indicates that it bans only mandatory arbitration agreements.

18

The MLA contains two separate provisions relating to arbitration clauses. The first is from the "limitations" section of the statute (10 U.S.C. § 987(e)(3)) and reads as follows:

> (e) LIMITATIONS.—It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . (3) the creditor *requires* the borrower to submit to arbitration.

10 U.S.C. § 987(e)(3) (emphasis added). The second provision is from the "Penalties and Remedies" section, which immediately follows the "limitations" section and reads:

> (f) PENALTIES AND REMEDIES.— . . . (4) ARBITRATION.— Notwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made.

10 U.S.C. § 987(f)(4).

The logical way to harmonize these provisions is as follows: (1) the MLA imposes a "limitation" upon creditors by prohibiting "required" arbitration agreements; and (2) when that "limitation" is violated, one of the "penalties" or "remedies" for the violation is that the arbitration agreement is unenforceable. That reading ensures that both sections of the statute mean something and that Congress's deliberate choice of organizing the statute makes sense.

19

Understood that way, the MLA does not preclude enforcement of the Arbitration Agreement here. Plaintiff indisputably had the right to reject arbitration when he signed up for Defendants' EWA product (and for 30 days thereafter). ER-114 (giving Plaintiff the right to "reject this Arbitration Agreement" by "send[ing] written notice of [his] rejection within 30 days" after his application was approved). Defendants' inclusion of the Arbitration Agreement was therefore lawful under Section 987(e)(3). *See Garrett v. Monterey Fin. Servs., LLC*, No. 18-cv-325, 2018 WL 3579856, at *4 (D. Md. July 25, 2018) (declining to find that an "arbitration provision violates the MLA" where "the arbitration provision contains an opt-out clause"). And because Section 987(f)(4) is only available as a "penalt[y]" or "remed[y]," Plaintiff's inability to identify any predicate violation of the MLA means that he cannot avoid enforcement of a voluntary arbitration agreement after the fact by pointing to Section 987(f)(4).

Relying on an out-of-circuit district court opinion, however, the court below rejected that straightforward reading of the MLA. According to the court, because the two sections of the MLA "accomplish different purposes," the "fact that § 987(e)(3) does not apply to opt-out arbitration agreements does not undermine the broad prohibition on *enforcing* arbitration agreements in § 987(f)(4)." ER-15-16. As the court saw it, "Section 987(e)(3) . . . goes beyond governing which arbitration agreements are unenforceable—it renders entire agreements *unlawful*, which leads

20

to additional consequences." ER-16. That reading, however, disregards the structure that Congress deliberately employed when constructing the statute, which places the consequences for violating Section 987(e) in the immediately following Section 987(f). That latter section, as discussed above, is entitled "Penalties and Remedies," and each of the provisions within it provides instructions on what consequences may follow in the event of a violation of the statute.[4]

To that point, whereas the district court ignored the headers to each of the two sections, it should have instead recognized them as providing important guideposts on how the statute is organized. As the Supreme Court has instructed, courts should construe statutes as a whole, "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation omitted); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (holding that "the title of a statute and the heading of a section" are "tools available for the resolution of a doubt" about "the meaning of a statute" (citation omitted)). Thus, the term "Penalties and Remedies"

---

[4] *See, e.g.,* 10 U.S.C. § 987(f)(1) ("MISDEMEANOR.—A creditor who knowingly violates this section shall be fined as provided in title 18, or imprisoned for not more than one year, or both."); *id.* § 987(f)(3) ("CONTRACT VOID.—Any credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract."); *id.* § 987(f)(5) ("CIVIL LIABILITY.— . . . A person who violates this section with respect to any person is civilly liable to such person for—(i) any actual damage sustained as a result, but not less than $500 for each violation; (ii) appropriate punitive damages; (iii) appropriate equitable or declaratory relief; and (iv) any other relief provided by law.").

21

acts as a crucial antecedent to Section 987(f)(4) and indicates that the entire section is designed to enumerate the "penalty" or "remedy" for the predicate statutory violations set forth in the immediately preceding Section 987(e).  Section 987(f), therefore, functions the same as any other penalties clause, which must be read along with the substantive provision to which it attaches, rather than as a separate provision establishing standalone legal prohibitions.  *See Almendarez-Torres*, 523 U.S. at 226 (holding that statutory subsection was "penalty provision" that "does not define a separate crime").

The ordinary meaning of "penalties and remedies" supports this reading, as well.  "Penalties" are defined as a "disadvantage, loss, or hardship *due to some action*."  *Penalty*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/penalty (last accessed Feb. 25, 2026) (emphasis added).  A "remedy" is defined as something that "corrects or counteracts" or "obtain[s] redress for a wrong."  *Remedy*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/remedy (last accessed Feb. 25, 2026).  Accordingly, if Section 987(f)(4) purports to render arbitration agreements unenforceable as a "penalty" or "remedy," as suggested by the header of the section, it must be tied to some other "action" or "wrong."  Under the MLA, the logical predicate "action" or "wrong," for which the penalty or remedy would be the invalidation of the arbitration

22

clause, would of course be the existence of a prohibited *mandatory* arbitration agreement under Section 987(e)(3).

Accordingly, because the MLA bars only mandatory arbitration agreements, this Court should reverse.

## II. Because Defendants' EWA Product Does Not Extend "Credit," the MLA Does Not Apply.

Second, the district court erred in determining that Defendants' EWA transactions constitute "credit" under the MLA. Any arbitration ban imposed by the MLA applies only if Defendants extended "consumer credit" to Plaintiff. 10 U.S.C. § 987(f)(4). The MLA's implementing regulations define "[c]onsumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) [s]ubject to a finance charge; or (ii) [p]ayable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1); *see* 10 U.S.C. § 987(i)(6) (providing that "consumer credit" will be defined by regulation). Those same regulations define "[c]redit," in turn, as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). But the EWA transactions here do not involve the creation of "debt," and therefore do not constitute an extension of credit covered by the MLA.

23

A. **Because Plaintiff Had No Obligation to Repay, No "Debt"—and Therefore No "Credit"—Was Created.**

"Debt"—and therefore "credit"—must entail a real and enforceable obligation to repay. Under black-letter rules of statutory interpretation, undefined terms in a statute or regulation—such as "debt"—are to be given "their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). The regulations also specify that "[w]ords that are not defined in this part or Regulation Z, or any interpretation thereof, have the meanings given to them by State or Federal law." 32 C.F.R. § 232.3(s). The "ordinary meaning" of a "debt" is an obligation to pay. Merriam-Webster defines "debt" as "a state of being under obligation to pay or repay someone or something in return for something received." *Debt*, Merriam-Webster Online, https://perma.cc/CHT7-MP8W (last accessed Jan. 17, 2026). The common legal definition is substantially the same: "Liability on a claim; a specific sum of money due by agreement or otherwise." *Debt*, Black's Law Dictionary (12th ed. 2024). Under each of these definitions, "debt" entails the same fundamental quality: a real, enforceable, and binding obligation to repay.

The MLA itself reinforces that understanding. By its own terms, the MLA's protections apply only to "[c]overed borrower[s]," which are defined in part as consumers who "become[] *obligated* on a consumer credit transaction." 32 C.F.R. § 232.3(g)(1) (emphasis added). The MLA also prohibits creditors from using "a check or other method of access" to a borrower's account "as security for the

24

*obligation.*"  10 U.S.C. § 987(e)(5) (emphasis added).  Similarly, under TILA and Regulation Z, which is intended to be read in conjunction with the MLA, *see* 32 C.F.R. § 232.3(s), a creditor must provide disclosures "before consummation of the transaction," 12 C.F.R. § 1026.17(b), with "[c]onsummation" defined as "the time that a consumer becomes contractually *obligated* on a credit transaction," 12 C.F.R. § 1026.2(a)(13) (emphasis added).  Indeed, Regulation Z requires disclosures only of *legally* enforceable obligations.  *See, e.g.*, 12 C.F.R. pt. 1026, Supp. I ¶ 5(c)-1.i ("The disclosures should reflect the credit terms to which the parties *are legally bound* at the time of giving the disclosures." (emphasis added)); *id.* ¶ 5(c)-1.iii ("The *legal obligation* normally is presumed to be contained in the contract that evidences the agreement.  But this may be rebutted if another agreement between the parties *legally modifies* that contract." (emphases added)).  All of this indicates that a "debt" must entail a concrete contractual or legal obligation.

Congress's use of the term "debt" in other federal consumer statutes further supports this meaning.  Most notably, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, defines "debt" as "any *obligation* or alleged *obligation* of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."  15 U.S.C. § 1692a(5) (emphases added).  That

25

definition is instructive here because the FDCPA, MLA, and TILA are all statutes designed to regulate different stages of credit transactions, with the MLA and TILA governing the extension of credit, and the FDCPA governing the collection of debt resulting from the extension of credit. *Cf. Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality) ("[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). Moreover, courts have looked to the FDCPA's definition of "debt" when interpreting analogous statutory schemes that do not define the term. *See, e.g.*, *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 410 (3d Cir. 2000) (construing the term "debt" in TILA consistently with its definition under the FDCPA). Once again, then, the authoritative definition of "debt" implies a legal obligation to repay—without a legal obligation, there can be no obligation "reduced to judgment."

Similarly, the Bankruptcy Code defines "debt" as "liability on a claim," 11 U.S.C. § 101(12), and it further defines "claim" as a "right to payment." 11 U.S.C. § 101(5)(A). In analyzing those provisions, the Supreme Court has explained that "a 'right to payment' is nothing more nor less than an enforceable obligation." *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990).

Case law from other contexts points in the same direction. For example, in *Thompson v. Commissioner*, 235 F.2d 599 (9th Cir. 1956), which analyzed what

26

constitutes a "bad debt" under the Internal Revenue Code, this Court wrote: "A debt is that which . . . one person is bound to pay to another, or perform for his benefit." *Id.* at 601 (internal quotation marks omitted); *see Gilman v. Comm'r*, 53 F.2d 47, 50 (8th Cir. 1931) ("The term 'indebtedness' as used in the Revenue act implies an unconditional obligation to pay."). Likewise, in *Perry v. United States*, 294 U.S. 330 (1935), which dealt with the right to payment on a war bond issued by the United States, the Supreme Court equated the words "public debt" in the Fourteenth Amendment with "public obligations." *Id.* at 354; *see id.* ("[T]his provision was undoubtedly inspired by the desire to put beyond question the obligations of the government issued during the Civil War.").

This understanding of "debt" is consistent with the CFPB's recent Advisory Opinion. There, the CFPB found that because covered EWA products "do[] not provide workers with the right to defer payment of debt or to incur debt and defer its payment," they are "not credit." 90 Fed. Reg. at 60071. In so doing, the CFPB looked to the "common meaning of debt," which it recognized to be "a sum of money due by certain and express agreement or a financial liability or obligation owed by one person, the debtor, to another, the creditor." *Id.* (internal quotation marks and citation omitted). Thus, the interpretation of the CFPB—the primary body

27

responsible for interpreting, updating, and enforcing Regulation Z—also entails a contractual or legal obligation.[5]

Applying the definition of "debt" derived from this growing chorus of authorities to the case here, Defendants' Advances to Plaintiff did not create any "debt" because Plaintiff had no obligation to repay them. The Customer Agreement expressly states that Defendants have "no legal or contractual claim" against Plaintiff "based on a failure to repay an Advance." ER-99. Moreover, Defendants do not engage in any debt collection activities; nor do they report customers to consumer reporting agencies. *Id.* And customers are explicitly advised that they may cancel their access to the product "at any time, regardless of whether [they] have an outstanding Advance that has not been repaid" and may "avoid billing for the subsequent statement period" by completing the request to cancel within three business days before the next billing date. ER-109. Accordingly, Plaintiff never had any "obligation" to repay the Advances and, therefore, incurred no debt.

---

[5] The CFPB's Advisory Opinion is consistent with a number of recently passed state statutes regulating earned wage access products. In most of those States, the laws recognize that earned wage access products are not credit and must be regulated separately from credit. *See, e.g.,* Ark. Code § 23-52-203(b); Ind. Code § 28-8-6-1002(a)(3); Kan. Stat. § 9-2407(a)(1)(A); La. Stat. § 9:3591.5; Mo. Stat. § 361.749.6(1)(b); Nev. Rev. Stat. § 604D.190; S.C. Code § 39-5-860(B), (D); Utah Code § 13-78-106(1)(b).

**B.** **The District Court Erred by Holding That Defendants' EWA Products Constituted an Extension of Credit.**

Following a flawed line of decisions stemming from *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025), the district court denied that a "debt" must entail a legal or contractual obligation to repay. As the court saw it: "The fact that the Customer Agreement limits Defendants' ability to seek *legal* recourse if customers fail to repay does not mean that customers have no obligation to repay whatsoever." ER-17. The justifications the district court offered for this approach reflect multiple fundamental errors and threaten to invite chaos across several industries.

First, the district court, as in *Orubo*, ignored the many definitions of "debt" cited above. Nowhere in the court's decision or in *Orubo* is there any attempt to define "debt" or confront any of the plain-meaning, legal, or statutory definitions detailed above. Nor does either decision cite any authority supporting a definition of "debt" that does *not* entail a legal obligation. The court's approach was therefore contrary to black-letter rules of statutory interpretation, which require that such "inquiries must begin . . . with the language of the statute itself," *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) (citation omitted).

Second, the district court, again following *Orubo*, erroneously relied not on the language of the statute but rather on now-stale commentary to Regulation Z that dealt with "deferred presentment" transactions. ER-18; *see also Orubo*, 780 F. Supp.

29

3d at 935; 12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)-2. The relevant section reads as such:

> ***Payday loans; deferred presentment***. Credit includes a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date.

12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)-2. According to the district court (ER-18), such commentary "expressly defines EWA products as 'credit,'" but this is incorrect. Rather, the commentary by its very terms makes clear that it applies only to *payday loans*—a product wholly distinct from EWA—and there is no indication in the commentary that it is seeking to define a new category of transactions that may be considered credit. *See* 12 C.F.R. pt. 1026, Supp. I, ¶ 2(a)(14)-2 ("This type of transaction is often referred to as a 'payday loan' or 'payday advance' or 'deferred-presentment loan.'"). Payday loans, like all loans, come with a legal obligation to repay and are therefore fundamentally distinct from EWA products.[6]

---

[6] Indeed, the district court's characterization of EWA transactions as "short-term payday loans" confirms that the court did not understand the fundamental nature of the transactions. ER-19. As the CFPB recently explained, payday loans are fundamentally different from EWA products. Payday loans include all the "significant indicia" of credit, including late fees, interest, underwriting, debt collection, recourse, and credit reporting. 90 Fed. Reg. at 60073. EWA products such as Defendants' Advances share none of those characteristics.

30

Third, the district court (like *Orubo*) further erred by relying on the MLA's purpose to support the assertion that the statute must be "liberally construed." *Orubo*, 780 F. Supp. 3d at 936 n.5 (citation omitted); *see* ER-19. As the Supreme Court has explained, "it is 'quite mistaken to assume . . . that any interpretation of a law that does more to advance a statute's putative goal must be the law.'" *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025) (citation omitted). For this reason, "the 'textual limitations upon a law's scope'"—here, the limitation to "debt"—"must be understood as 'no less a part of its purpose than its substantive authorizations.'" *Id.* (citation omitted). The district court, following *Orubo*, disregarded those settled interpretive principles and instead invoked the law's "purpose" as a justification to expand the law beyond its proper limit.

Moreover, understanding the MLA to be focused on transactions that create enforceable financial obligations fully aligns with the statute's purpose. The Department of Defense has explained that the "overarching aim" of the MLA is "to promote readiness by taking steps to reduce the risk that a Service member or his or her family could get caught in a 'debt trap.'" Office of the Under Secretary of Defense for Personnel and Readiness, Department of Defense, *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43560, 43566 (July 22, 2015) (quoting Department of Defense, Office of the Secretary, *Limitations on Terms of Consumer Credit Extended to Service Members*

31

*and Dependents*, 72 Fed. Reg. 18157, 18159 (Apr. 11, 2007)). Only when a servicemember is obligated to repay a debt does a transaction create such a risk. Under such circumstances, when the servicemember does not repay the amount initially owed, the outstanding balance will grow over time as unpaid interest is added to the principal, making it harder to pay off and leading to greater financial strain. *See id.* at 43589. However, where a servicemember has no obligation to repay, that risk is not present. Instead of being "trap[ped]" by a cycle of escalating debt when confronting a delinquent loan, *id.*, a servicemember who has taken an Advance from Defendants can simply walk away, with no adverse impact on his or her future finances. To the extent that any imputed statutory purpose has any import here, it actually supports the conclusion that Defendants' Advances are not subject to the MLA's restrictions.

Fourth, the district court's opinion threatens to cause chaos across several industries. By suggesting that the "obligation" necessary to impose the disclosure requirements found under TILA and the MLA need not be legal obligations, the court opens the door to subjective or even imagined "obligations" providing the requisite basis to trigger statutory disclosure requirements. Indeed, under the court's reading of the statute, "obligation" could mean entirely different things based on the individual, subjective beliefs of any given customer. However, TILA is a disclosure regime—it requires businesses and individuals to issue certain disclosures to their

32

customers. *See* 15 U.S.C. § 1601(a) ("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms."). It therefore relies on an objective definition of credit and would be entirely unworkable if the required disclosures depended on each customer's subjective belief regarding a product instead of the parties' contractual obligations. "[C]reditors need sure guidance through the 'highly technical' Truth in Lending Act." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980) (citation omitted).

Finally, the district court again acted erroneously by conflating the *procedures* surrounding repayment and obtaining advances with the legal obligation to repay. To support its finding that Defendants "offer a product that requires promise of repayment, and therefore constitutes 'credit,'" the court pointed to two things: first, that "customers can only secure an EWA if they link a bank account and consent to mandatory debits upon receipt of their next paycheck"; and second, that "[i]f customers fail to repay an EWA, customers cannot initiate another transaction until money is deposited into their account." ER-18. Neither of these renders Defendants' Advances "credit." First, the fact that customers cannot get *new* Advances from Defendants without making first repaying a prior Advance does not mean they have an enforceable "debt" for the prior Advance. Second, it cannot be the case that someone incurs a "debt" any time that person electronically authorizes a future payment—especially when that person may revoke that authorization without

33

repercussions.  Individuals who sign up for video-streaming subscriptions or gym memberships do not have any obligation to pay for future months simply because they have enrolled in an autopay system.  Nothing in the text of the MLA or TILA provides that the existence of "credit" turns on whether a company establishes a procedure for repayment.  Instead, the transaction must create a "debt."  Because the transactions at issue here involved no such creation of debt, the MLA does not apply.

### III.  The MLA Does Not Apply Because Defendants Do Not Impose "Finance Charges."

Even if Plaintiff could show that the EWA transactions involved the extension of credit, that would not be sufficient to trigger application of the MLA.  Rather, Plaintiff would also need to establish that the transactions were subject to a "finance charge."  32 C.F.R. § 232.3(f)(1) (defining "[c]onsumer credit" subject to the MLA).[7]

"Finance charge" under the MLA "has the same meaning as 'finance charge' in Regulation Z."  32 C.F.R. § 232.3(n).  Under Regulation Z, "[t]he finance charge . . . includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension

---

[7] An extension of credit that is not subject to a finance charge may also qualify as "[c]onsumer credit" covered by the MLA if it is payable "by a written agreement in more than four installments." 32 C.F.R.§ 232.3(f)(1).  Plaintiff has not invoked, and could not invoke, that prong of the definition, because Defendants' Advances are not subject to repayment in multiple installments.

34

of credit. It does not include any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a).

The district court held that the optional expedited delivery fees Plaintiff paid to receive the cash advance more quickly constituted a "finance charge." ER-19-22. That holding was erroneous for several reasons.

First, the expedited delivery fees were not "imposed" by Defendants. "Impose" means "to force someone to accept (something)." *Impose*, Merriam-Webster Online, https://perma.cc/M87Q-X9GZ (last access Jan. 25, 2026). Here, Defendants did not force Plaintiff (or any customer) to pay the expedited delivery fees. Plaintiff was given the option to pay the expedited delivery fee to receive the cash advance more quickly than the money would otherwise be transferred. Customers choose of their volition whether to pay the fee based on how quickly they want to receive the funds. Because the fee was entirely optional, Defendants did not "impose" the fee on Plaintiff, and the fee was not, therefore, a "finance charge."

Relatedly, the expedited delivery fees also are not a "condition of" or "incident to" securing an Advance because users like Plaintiff can obtain the same Advances whether or not they choose to pay extra to expedite the transfer. Under its common legal definition, "incident" means "[a] dependent, subordinate, or consequential part (of something else)." *Incident*, Black's Law Dictionary (12th ed. 2024). The term "condition" means "[a] stipulation or prerequisite." *Condition*,

35

Black's Law Dictionary (12th ed. 2024). Expedited delivery fees are neither of those. Rather, they are independent expenses tied to an optional bonus feature (expedited transfer of the funds) associated with the product, and they have nothing to do with whether a user may receive an Advance.

The CFPB adopted this very reasoning in its recent Advisory Opinion, which should guide the Court's analysis here. The CFPB explained that, "[i]n the normal course, expedited delivery fees are the cost of obtaining earned wages more quickly than via ACH, and are triggered by the consumer's opting for expedited delivery; they are [therefore] not 'directly or indirectly imposed.'" 90 Fed. Reg. at 60075. In so doing, the CFPB found support from a 2003 rule in which the Federal Reserve Board considered "whether two types of expedited fees in connection with credit cards accessing home equity lines of credit are finance charges: a fee for expediting a consumer's payment, and a fee expediting delivery of the physical card." *Id*.[8] The Federal Reserve Board determined that *neither* was a finance charge because the consumer had a "reasonable means" for making his payment without paying the fee and because he could obtain the card by standard mail service without a fee. *Id*. Looking back on that rule, the CFPB concluded that "[f]ees that EWA providers

---

[8] Prior to the creation of the CFPB, the Federal Reserve Board was tasked with interpreting TILA and its implementing regulation, Regulation Z. The Dodd–Frank Act reassigned the rulemaking and interpretive authority under TILA from the Board to the CFPB, effective July 21, 2011. 12 U.S.C. § 5512; 75 Fed. Reg. 57252 (Sept. 20, 2010).

36

charge for expedited delivery of EWA fit squarely into this mold, since consumers can receive exactly the same service without paying the fee." *Id.* That reasoning applies squarely to the optional expedited delivery fees Plaintiff paid to Defendants. Plaintiff had an alternative means of obtaining an Advance without paying the fee by not electing expedited delivery. It was his choice whether or not to pay the fee based on how quickly he wished to receive the funds.

The CFPB also found support from the Eleventh Circuit's widely cited decision in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996).[9] In that case, the Eleventh Circuit held that optional fees to expedite the mailing of loan documents and disbursement of a loan refinancing were not finance charges because they were not incident to the extension of credit. *Id.* at 579. In doing so, the Eleventh Circuit held that, "[s]ince the Veales could have chosen not to pay the Federal Express fee and the bank did not require it, then the fee was not imposed as an incident to the extension of credit and need not be included in the Finance Charge." *Id.* Therefore, the court found, "the charge here was not incidental to the extension of credit." *Id.* As the CFPB explained in its Advisory Opinion, such fees are "very similar to the expedited delivery fees charged by EWA providers" and therefore the *Veale* court's reasoning applied with equal strength in the EWA context. 90 Fed. Reg. at 60075.

---

[9] Although the parties here briefed *Veale* at length, the district court did not address it in its decision.

The CFPB Advisory Opinion is especially significant because, in it, the CFPB formally withdrew the prior proposed interpretative rule (the "PIR") on which *Orubo* and its progeny "rel[ied] heavily" when making the determination that optional expedited delivery fees are "finance charges." *Id.* at 60071 n.23. The district court's opinion here is no exception, citing only the portion of *Orubo* that relied on the PIR as support for its otherwise unfounded holding that "the expedite fees are 'incident to' the EWAs because the expedite fees impact the timing of funds, which is 'a material term of credit.'" ER-20 (quoting *Orubo*, 780 F. Supp. 3d at 938). In *Orubo*, the court stated the same principle, finding support for this in the PIR:

> The time at which funds are received is a material term of credit. Thus, payment of the lightning fee is a necessary condition to the extension of credit on the terms being offered, which include receipt of the credit "within minutes." *See* Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. at 61362 [i.e., the PIR] ("Though consumers may not have to opt for faster funds, when they do so, the resulting speed is a feature of the credit extended, so the resulting fee is part of the cost of credit.").

780 F. Supp. 3d at 938. The CFPB has formally withdrawn this proposed rule and "officially rejected the interpretations advanced in it." 90 Fed. Reg. at 60076 n.81.

Finally, because the optional expedited delivery fee is "of a type payable in a comparable cash transaction," 12 C.F.R. § 1026.4(a), it is expressly excluded from the definition of finance charge under Regulation Z. Banks frequently charge fees to expedite settlement of check deposits. *See, e.g.*, *Mobile Check Deposit*, PNC, https://perma.cc/7HSY-L7W8 (last accessed Jan. 19, 2026). Moreover, virtually all

digital wallets offer expedited withdrawals for additional fees.  *See, e.g., Standard Bank Transfers FAQ*, Venmo, https://perma.cc/39XT-EVAN (last accessed Jan. 16, 2026).  Such cash transactions are "comparable" with Defendants' expedited delivery fee.  Accordingly, the expedited delivery fee is not a "finance charge."

The district court's attempt to circumvent this provision is unavailing.  In its opinion, the court recognized that the CFPB had previously held that "an expedite fee associated with a different EWA product was analogous to other 'transfer fees for non-credit products' and thus, was exempt from the 'finance charge' definition." ER-21 (quoting CFPB, Payactiv Approval Order, at 5 (Dec. 30, 2020), https://files.consumerfinance.gov/f/documents/cfpb_payactiv_approval-order_2020-12.pdf).  However, the court distinguished that order because "a defining feature of the expedite fee in the CFPB order was that it *did not* 'vary based on . . . the amount of the transaction,'" whereas "[h]ere, the expedite fees are distinguishable because they *do* vary based on the amount of the transaction."  *Id.* (citation omitted).  Thus, according to the court, "the CFPB's analysis in the Payactiv Approval Order d[id] not bear on the Court's determination."  *Id*.  The court failed to recognize, however, that this was merely one of *many* reasons cited by the CFPB

39

why the fee in question did not constitute a "finance charge," and the court cited to nothing indicating that this particular feature is dispositive.[10]

Accordingly, the expedited delivery fees are not "finance charges." They are neither "imposed" on the consumer nor a "condition of" an extension of credit, as explained in great detail in the CFPB's Advisory Opinion, and they are of a type payable in a comparable cash transaction.

## IV. Because TILA and the GPLA Impose No Ban on Arbitration Agreements, the District Court Should Have Allowed Plaintiff's Claims Under Those Statutes to Proceed to Arbitration.

For the foregoing reasons, the district court should have granted Defendants' motion in its entirety. However, even if the district court correctly held that Plaintiff's MLA claim cannot proceed to arbitration, its refusal to allow Plaintiff's TILA and GPLA claims to proceed to arbitration was nevertheless erroneous. The FAA "reflects a 'liberal federal policy' in favor of arbitration," *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014) (citation omitted), and "any doubts

---

[10] The district court's analysis is also flawed to the extent that it relies on Defendants' alleged advertising representations to support its holding. *See, e.g.*, ER-20-21 (discussing Defendants' alleged advertising practices). Nowhere does Regulation Z or the MLA state that advertising representations can convert certain fees into finance charges. Even if Defendants' advertising materials promote the option of rapid delivery—and companies are, of course, free to tout various optional features of their products—those materials cannot override the express written terms of the agreement or the nature of the fees themselves. Whether something is a finance charge turns on the objective terms of the transaction, not a company's marketing choices.

40

concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25. A party seeking to establish that Congress precluded enforcement of arbitration agreements in a particular context "faces a stout uphill climb" and must "bear[] the heavy burden of showing . . . a clear and manifest congressional command to displace the Arbitration Act and outlaw agreements like theirs." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510-11 (2018). Under TILA, there is no provision prohibiting arbitration agreements. Accordingly, there is no "clear and manifest congressional command to displace the Arbitration Act" with respect to that claim, and therefore the district court should have sent Plaintiff's TILA claim to arbitration. Similarly, under the GPLA, arbitration agreements in covered loan contracts are unenforceable only "if the contract is unconscionable," Ga. Code Ann. § 16-17-2(c)(2), which Plaintiff has never alleged. Accordingly, Plaintiff's GPLA claim, too, should have proceeded to arbitration.

A Fourth Circuit case, *Espin v. Citibank, N.A.*, supports that understanding. 126 F.4th 1010 (4th Cir. 2025). There, the plaintiffs brought claims under both the MLA and the Servicemembers Civil Relief Act ("SCRA") in connection with their credit card accounts. *See id.* at 1013. The court held that plaintiffs were required to arbitrate their SCRA claims because nothing in that statute demonstrated any intention of Congress to override the FAA. *Id.* at 1014-15. However, the court simultaneously remanded plaintiffs' MLA claims to the district court because it

recognized that plaintiffs may have been able to show on remand that their dispute arose out of the "extension of consumer credit" within the meaning of Section 987(f)(4) of the MLA. *Id*. at 1019-20. *Espin,* therefore, stands for the principle that, even where a defendant cannot compel arbitration of an MLA claim (or even if some of the claims demand further analysis as to whether they are subject to arbitration), a court should nonetheless compel any non-MLA claims to arbitration. *Id*. The district court here failed to adhere to this principle.

Plaintiff cannot overcome the FAA's strong presumption in favor of arbitration with respect to his TILA and GPLA claims simply by adding an MLA claim. Courts in this circuit routinely compel TILA claims to arbitration. *See, e.g.*, *Stone v. Mid Am. Bank & Tr. Co.*, No. 2:18-CV-87-RMP, 2018 WL 4701843 (E.D. Wash. Aug. 31, 2018) (compelling arbitration of a TILA claim); *Jones v. Gen. Motors Corp.*, 640 F. Supp. 2d 1124 (D. Ariz. 2009) (same); *Gray v. Conseco, Inc.*, No. SA CV 00-322DOC(EEX), 2000 WL 1480273 (C.D. Cal. Sept. 29, 2000) (same). The mere fact that Plaintiff also brings an MLA claim does nothing to change the FAA's presumption in favor of arbitration with respect to those other claims.

Indeed, the district court's contrary ruling threatens to produce absurd results. Section 987(f)(4) of the MLA states that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered

42

member or dependent of such a member." 10 U.S.C. § 987(f)(4). According to the district court, this language "does not limit the arbitration ban to the arbitration of claims brought under the MLA itself" and therefore could conceivably apply to *any* cause of action involving the extension of consumer credit. ER-23. However, if the court were correct on this, a plaintiff would have no need to bring an MLA claim at all in order to claim the MLA's prohibition on arbitration agreements, just so long as the claim "involv[es] the extension of consumer credit." 10 U.S.C. § 987(f)(4). Moreover, the prohibition could be interpreted so broadly as to cover disputes that the drafters of the MLA plainly did not intend to preclude from arbitration. Nothing in the MLA or the congressional record suggests that Congress intended the MLA to displace arbitration of claims under *other* statutes or legal claims—those that do not contain the "contrary congressional command" required to displace the FAA. *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (citation omitted). This Court should reject such an overbroad interpretation of the MLA.

## CONCLUSION

This Court should reverse the decision below and remand to the district court with instructions to order Plaintiff to arbitrate his individual claims and stay the case while arbitration is pending.

43

Dated:  February 27, 2026                    Respectfully submitted,

                                             /s/ Matthew P. Previn

                                             Matthew P. Previn
                                             PAUL HASTINGS LLP
                                             200 Park Avenue
                                             New York, NY 10166
                                             (212) 318-6000

                                             Michael Morrill
                                             PAUL HASTINGS LLP
                                             71 S. Wacker Drive
                                             Chicago, IL  60606
                                             (312) 499-6000

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 25-7035

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> The following appeals may present issues similar to the issues presented in this case:
> Moss v. Cleo AI, Inc., No. 25-5856
> Vickery v. Empower Finance, Inc., No. 25-6377
> Russell v. Dave Inc., No. 26-12

**Signature** | /s/ Matthew P. Previn      **Date** | February 27, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                    *New 12/01/2018*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7035

I am the attorney or self-represented party.

**This brief contains** 10,466 **words, including** 0 **words**

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Matthew P. Previn **Date** February 27, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 27, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit via the ACMS system and that service on all counsel of record will be accomplished by the ACMS system.

*/s/ Matthew P. Previn*
Matthew P. Previn
