No. 25-7035

# United States Court of Appeals for the Ninth Circuit

JOHN REVELL, individually, on behalf of all others similarly situated, and on behalf of the general public,

*Plaintiff-Appellee,*

– v. –

GRANT MONEY, LLC, a Delaware corporation doing business as Grant; KIKOFF, INC., a Delaware corporation,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA, NO. 3:35-CV-05994-TLT,
THE HONORABLE TRINA L. THOMPSON

## BRIEF OF *AMICI CURIAE* AMERICAN FINTECH COUNCIL AND FINANCIAL TECHNOLOGY ASSOCIATION IN SUPPORT OF APPELLANTS

JAMES KIM
DANA N. LEVIN
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(858) 550-6000

EPHRAIM A. MCDOWELL
ELIAS S. KIM
JADE FORD*
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

*Counsel for Amici Curiae American Fintech Council and Financial Technology Association*

* Admitted to practice in New York only. Not admitted to practice in Washington, DC. Supervised by active members of the Washington, DC Bar.

CP COUNSEL PRESS  (800) 4-APPEAL • (391189)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, American Fintech Council and Financial Technology Association certify that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

/s/ *Ephraim A. McDowell*

Ephraim A. McDowell
COOLEY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004-2400
Telephone:  (202) 842-7800
emcdowell@cooley.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ..................................................................1

INTRODUCTION .......................................................................................2

ARGUMENT ..............................................................................................5

I.  EWA Offers a Pro-Consumer Solution to a Persistent Economic
    Problem ...........................................................................................5

    A.  EWA Gives Workers Timely Access to Their Earned Wages
        and Allows Them to Take Control of Their Personal Finances ...........5

    B.  EWA Services Are Fundamentally Distinct from Payday Loans
        and Other Credit Products ....................................................9

II.  Federal Courts Should Not Disrupt the Ongoing, Nationwide EWA
     Policymaking Process ...................................................................13

    A.  States, Congress, and the CFPB Are Currently Engaging in a
        Robust Policymaking Process Around EWA ..................................14

    B.  Courts Should Not Apply Outdated Federal Laws to New EWA
        Services .......................................................................18

III.  Affirming the Decision Below Would Upend the EWA Industry and
      Harm Consumers ..........................................................................27

CONCLUSION ..........................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004)............................................................................24

*Olson v. Unison Agreement Corp.*, No. 23-2835,
2025 WL 2254522 (9th Cir. Aug. 7, 2025) ...................................22, 23

*Orubo v. Activehours, Inc.*,
780 F. Supp. 3d 927 (N.D. Cal. 2025)........................................18, 22

*United States v. Martin*,
974 F.3d 124 (2d Cir. 2020) ..............................................................23

*Revell v. Grant Money, LLC*, No. 25-cv-5994,
2025 WL 3167318 (N.D. Cal. Nov. 5, 2025) ................... 2, 3, 18, 19, 20, 22, 24

*Veale v. Citibank, F.S.B.*,
85 F.3d 577 (11th Cir. 1996) ............................................................24

**Statutes and Regulations**

10 U.S.C.
   § 987...............................................................................................13
   § 987(a) ...........................................................................................25
   § 987(b) ...........................................................................................25
   § 987(c) ...........................................................................................25

15 U.S.C.
   § 1601(a) ....................................................................................25, 26
   § 1602(f)...........................................................................................19
   § 1604(a) ..........................................................................................17
   § 1605(a) ..........................................................................................23
   § 1631................................................................................................13
   § 1638................................................................................................13
   § 1638(a)(4) .....................................................................................25
   § 1638(a)(6) .....................................................................................25
   § 1692a(5) ........................................................................................19

# TABLE OF AUTHORITIES
## (continued)

Ark. Code § 23-52-203 ..............................................................15

Cal. Code Regs. tit. 10, § 1461(e).............................................16

Ind. Code § 28-8-6-1002 ..........................................................15

Kan. Stat. § 9-2407 ...................................................................15

La. Stat. § 9:3591.5 ...................................................................15

Mo. Stat. § 361.749 ...................................................................15

Nev. Rev. Stat. Ann
§ 604D.160..........................................................................14
§ 604D.190..........................................................................15
§ 604D.190(1)......................................................................27
§ 604D.200..........................................................................14
§ 604D.410..........................................................................15

S.C. Code § 39-5-860................................................................15

Utah Code § 13-78-106..............................................................15

12 C.F.R.
§ 1026, App. J § (b)(2)........................................................25
§ 1026, App. J § (c).............................................................26
§ 1026 Supp. I 2(a)(14)........................................................21
§ 1026.1(c)(1)(iii) ...............................................................18
§ 1026.2(14)..........................................................................3
§ 1026.4(a) .......................................................................3, 23
§ 1026.18..............................................................................26
§ 1026.22(a)(1) ....................................................................25

32 C.F.R.
§ 232.3(h)..........................................................................3, 20
§ 232.3(n)..........................................................................3, 23

85 Fed. Reg. 79404 (Dec. 10, 2020) ........................................17

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

90 Fed. Reg. 3622 (Jan. 15, 2025) ..................................................................17

90 Fed. Reg. 60069 (Dec. 23, 2025) .............................................12, 17, 18, 19, 23

**Proposed Legislation**

Earned Wage Access Consumer Protection Act, H.R. 7428, 118th
    Cong. (2024) ...............................................................................................16

Earned Wage Access Consumer Protection Act, H.R. ---, 119th Cong.
    (2026) ...................................................................................................16, 17

H.B. 2131, 83rd Leg., 2025 Reg. Sess. (Or. 2025) .......................................27

S.B. 1119, 68th Leg., 1st Reg. Sess. (Idaho 2025) ........................................27

S.B. 53-28, 69th Leg., 2025 Reg. Sess. (Wash. 2025) ..................................27

**Miscellaneous**

Alliance for Innovative Regulation, *Earned Wage Access: Exploring
    Policy Implications & Frameworks* (2024) ...........................................12

Emily Batdorf, *Living Paycheck to Paycheck Statistics 2024*, Forbes
    (Apr. 2, 2024)................................................................................................6

Lisa Berdie et al., *Exploring Earned Wage Access as a Liquidity
    Solution*, Financial Health Network (Nov. 2023)..................................25

Josh Bersin, *On-Demand Pay: Real-Time Pay to Make Workers
    Happy* (2021) .....................................................................................5, 10, 12

Mark Brnovich, Attorney General of Arizona, Opinion No. I22-005:
    Earned Wage Access Products (Dec. 16, 2022) ............................16, 27

BLS, Current Employment Statistics, Length of Pay Periods ..................5

CFPB, *Can a Payday Lender Garnish My Bank Account or My Wages
    if I Don't Repay the Loan?* (Nov. 25, 2024).......................................11

# TABLE OF AUTHORITIES
## (continued)

Page(s)

CFPB, *Can Taking Out a Payday Loan Help Rebuild My Credit or Improve My Credit Score?* (Nov. 25, 2024) ........................................ 11

CFPB, Office of Research, *CFPB Data Point: Payday Lending* (Mar. 2014) .................................................................................................. 10

CFPB, Office of Research, *Insights from the Making Ends Meet Survey* (July 2020) ...................................................................................... 5

Alex Clere, *What Nevada's Pioneering Earned Wage Access Law Really Means*, FinTech Magazine (June 26, 2023) ............................... 15

Conference of State Bank Supervisors, *50-State Survey of Consumer Finance Laws* (Nov. 19, 2020) ...................................................... 13

Jonathan M.V. Davis, *The Impacts of Earned Wage Access* (Nov. 2025) ............................................................................................... 6, 8

*Debt*, Black's Law Dictionary (12th ed. 2024) ................................. 19, 21

*Debt*, Merriam-Webster.com Dictionary ................................................ 19

FTA, *Just the Facts: Earned Wages Access* (June 7, 2022) ................. 7, 8

FTA, *FTA Applauds Release of Bipartisan Earned Wage Access Legislation* (Jan. 13, 2026) ................................................................. 16

FTI Consulting, *Memorandum Re: Direct to Consumer Earned Wage Access User Survey Key Findings* (July 7, 2021) ............................. 8, 9

*Impose*, Merriam-Webster.com Dictionary ........................................... 23

Instant Financial, *Wages and Wellbeing: Analyzing the Impact of Same-day Pay* (2022) ............................................................................ 9

Devina Khanna et al., *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Financial Health Network (Apr. 2021) ........ 5, 7, 8

Austin Knudsen, Attorney General of Montana, 59 Att'y Gen. Op. 2 (Dec. 22, 2023) ............................................................................... 16, 27

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Liability*, Black's Law Dictionary (12th ed. 2024)......................................................21

Marshall Lux et al., *Earned Wage Access: An Innovation in Financial Inclusion?*, Harvard Kennedy School (June 2023)...........................5, 6, 9, 10, 13

Leslie Parrish, *DailyPay Use and Outcomes: A Summary of Survey Findings*, Aite-Novarica Group (Aug. 2021) ..............................................8, 9, 13

Pew Charitable Trusts, *Payday Loan Facts and the CFPB's Impact* (May 2016).................................................................................................10

Kerri M. Raissian et al., *Connecticut Earned Wage Access User Impact Study* (Univ. Conn. 2025) ........................................................30

# INTEREST OF AMICI CURIAE[1]

American Fintech Council (AFC) is an industry association representing responsible and innovative financial technology companies and banks. AFC's mission is to promote a transparent, inclusive, and customer-centric financial system by supporting responsible innovation in financial services and encouraging sound public policy. AFC members foster competition in consumer finance and pioneer products for underserved consumers.

The Financial Technology Association (FTA) represents industry leaders in financial technology. FTA champions the power of technology-centered financial services and advocates for the modernization of financial regulation to support inclusion and responsible innovation. FTA believes in breaking down barriers to give small businesses, entrepreneurs, and consumers greater access to financial services. FTA's members are innovative companies driving competition with lower-cost products. FTA prioritizes trust, transparency, and fairness in the financial technology industry, and its members put consumers first.

---

[1] No party or party's counsel authored this brief in whole or in part, and no one other than *amici* and their counsel have made a monetary contribution to this brief's preparation and submission. Although Appellant Kikoff is an AFC member, Kikoff did not contribute money that was intended to fund preparing or submitting the brief. Fed. R. App. P. 29(a)(4)(E). Both parties consented to the filing of this brief.

## **INTRODUCTION**

This case involves an innovative financial service called earned wage access (EWA). EWA providers transfer to customers a portion of their earned wages ahead of the normal payroll schedule, so they can use their earned, yet unpaid, wages to cover regular expenses and emergency costs. EWA services thus flip the paradigm of wage payment: They liberate workers from rigid payroll schedules through access to the money they have earned whenever they may need it.

Unlike payday loans, EWA poses minimal risk for workers. Critically, EWA users have no legal obligation to repay a transfer, and EWA providers have no contractual right to seek any recovery of transferred funds from a user. Nor can the EWA provider charge any penalties, late fees, or interest. Instead, if a user declines to repay a transfer of funds, the only effect is that he cannot obtain further advances until he repays the current advance. Most EWA providers offer access to earned wages without any mandatory charges—they charge a small fee only if the customer requests optional expedited delivery of the transfer. Thus, the defining attributes of EWA are overwhelmingly consumer friendly and very different from loans: users can obtain early access to their earned wages for free, have no legal obligation to repay transfers, and cannot be charged any financial penalty for nonpayment.

Nonetheless, the district court below held that the plaintiffs had plausibly alleged that EWA transfers provided by Grant Money, LLC violated the Truth in

Lending Act (TILA) and Military Lending Act (MLA). The court's decision is severely flawed because those laws do not apply to EWA at all. First, the court erred in holding that Grant Money extends "credit." *Revell v. Grant Money, LLC*, No. 25-cv-5994, 2025 WL 3167318, at \*10 (N.D. Cal. Nov. 5, 2025). "Credit" means the right "to incur *debt* and defer its payment." 32 C.F.R. § 232.3(h) (emphasis added); *see* 12 C.F.R. § 1026.2(14) (similarly defining "credit"). Here, EWA users incur no debt because they have no obligation to repay a transfer. Second, the court erred in holding that Grant Money's "expedite fees" are "finance charges." *Revell*, 2025 WL 3167318, at \*12. A "finance charge" is a fee "*imposed* directly or indirectly by the creditor" on a consumer "as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added); *see* 32 C.F.R. § 232.3(n) (relying on TILA's definition). Optional expedited-delivery fees are not *imposed* by EWA providers as an incident to or condition of credit, but instead voluntarily paid by users. Indeed, the Consumer Financial Protection Bureau (CFPB)—the federal agency charged with administering TILA—agrees that optional expedited-delivery fees are not finance charges.

It is unsurprising that decades-old federal lending laws do not apply to new EWA services that do not resemble credit. Congress enacted those laws to address entirely different products: loans. Recognizing as much, the CFPB has concluded that TILA does not apply to most types of EWA services, including services like

Grant Money's. Additionally, numerous States have passed or are considering new legislation tailored specifically to EWA. And Members of Congress from both parties have drafted EWA-specific federal legislation. *Amici* welcome such sensible regulation that protects consumers while accounting for EWA's unique features.

Affirming the decision below would not only run counter to existing law but also undermine the ongoing democratic policymaking process. Such a decision would render EWA in violation of federal lending laws and likely require EWA providers to stop offering the service or fundamentally restructure it to be less consumer friendly. If EWA providers are deemed by this Court to be lenders, increased compliance costs and regulatory burdens will materially change the economics of offering the service and may well drive some providers from the market. Those that remain may be effectively forced or incentivized to act like lenders by imposing interest, charging penalties for nonpayment, and pursuing customers for payment, including through debt collectors and lawsuits—practices that EWA providers do not engage in today. That result would harm consumers and businesses alike by eliminating a transformative and low-risk service from the market—a service that millions of Americans now rely on. This Court should reverse.

4

# ARGUMENT

## I. EWA OFFERS A PRO-CONSUMER SOLUTION TO A PERSISTENT ECONOMIC PROBLEM

EWA services benefit workers by allowing them to access their earned wages earlier than employer payroll schedules would ordinarily allow. And because EWA providers neither require customers to repay transfers, nor charge interest or late fees, EWA provides a transparent and safer way for consumers to meet their financial needs without resorting to riskier alternatives, such as payday loans.

### A. EWA Gives Workers Timely Access to Their Earned Wages and Allows Them to Take Control of Their Personal Finances

1. Traditional wage payment systems often fail to meet the real-world needs of workers. Workers typically want to be paid promptly after they have performed work, so they can cover regular expenses and emergency costs. *See* Josh Bersin, *On-Demand Pay: Real-Time Pay to Make Workers Happy*, at 3, 5 (2021), https://perma.cc/CW5W-CESN; Devina Khanna et al., *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Financial Health Network, at 3 (Apr. 2021), https://perma.cc/6U3S-Y2QP. But administrative burdens and costs of running payroll make it difficult for employers to distribute pay more frequently. *See* Marshall Lux et al., *Earned Wage Access: An Innovation in Financial Inclusion?*, Harvard Kennedy School, at 8 (June 2023), https://perma.cc/9CX2-9JSV. As of February 2023, only 27 percent of workers were paid weekly or more

5

frequently. BLS, *Current Employment Statistics, Length of Pay Periods*, https://perma.cc/6YGH-RGRR (last visited Feb. 2, 2026).

Even weekly pay cycles may not provide workers with sufficient short-term liquidity. Many Americans live paycheck to paycheck, which means they cannot address expenses that arise between their payroll dates. *See* Lux, *supra* at 7; CFPB, Office of Research, *Insights from the Making Ends Meet Survey*, at 3 (July 2020), https://perma.cc/2LVE-TLAC. The rising cost of living has placed an increasing number of workers in that position. *See* Emily Batdorf, *Living Paycheck to Paycheck Statistics 2024*, Forbes (Apr. 2, 2024), http://bit.ly/3NTROmM. And even workers who typically earn enough to accrue savings may face expenses or emergencies that are difficult to manage until their next payroll date.

2. Over the last decade, the EWA industry has introduced a new service to address this longstanding liquidity problem. EWA providers use software and data to calculate the wages workers have already earned. *See* Jonathan M.V. Davis, *The Impacts of Earned Wage Access*, at 3 (Nov. 2025) (commissioned by EarnIn), https://perma.cc/329F-SPPS. They then provide early access to a portion of those earned wages, while typically settling the amount of the transfer on the next payroll date. But critically, EWA services do not require user repayment; and they expressly waive any right to compel or collect any payments from users. *See* AFC, Comment re: 2024 Paycheck Advance Interpretive Rule, Dkt. CFPB-2024-0032, at 7 (Aug. 29,

6

2024) ("AFC Comment"), https://perma.cc/KWR9-C5ZT. Instead, if a customer declines to repay, he simply loses the ability to use the service in the future. Nor does failing to repay a transfer lead to additional costs—*amici* are unaware of any EWA provider that charges interest, late fees, or penalties. FTA, Comment re: 2024 Paycheck Advance Interpretive Rule, Dkt. CFPB-2024-0032, at 3 (Aug. 30, 2024), https://perma.cc/E23E-F2CQ.

EWA providers fall into two broad categories of "service models": employer-based models and direct-to-consumer models. FTA, *Just the Facts: Earned Wages Access* (June 7, 2022) ("FTA Facts"), https://perma.cc/55CW-Z7WG. Employer-based models use software to obtain data from employers or their payroll providers. Khanna, *supra* at 5. That data allows EWA providers to determine the amount of accrued wages owed to individual workers. Thus, when a worker requests earned wages, the EWA provider transfers those earned wages without requiring the worker to submit additional information. In turn, the EWA provider coordinates with the employer to settle the amount of any EWA through the employer's payroll process so that the worker is not paid twice for the same work. *Id.*

The second EWA model provides the service directly to consumers. Direct-to-consumer providers broaden access to EWA by offering the service directly to consumers who demonstrate their earnings. *See* AFC Comment, *supra* at 3. While some providers connect to workers' bank accounts to verify direct-deposited

earnings, FTA Facts, *supra* at 1, others review paystubs, timesheets, or other similar materials that verify earnings, AFC Comment, *supra* at 3. Direct-to-consumer providers do not settle the amount of any EWA transfer through the employer's payroll process. Instead, they allow customers to provide revocable permission to debit their bank accounts to repay the transfer. *See* Khanna, *supra* at 5.

3. A growing body of evidence shows that EWA helps workers afford critical expenses. Multiple studies have found that people often use EWA to pay for regular expenses—like groceries, utilities, gasoline, and prescriptions—when they become due. *See* Davis, *supra* at 9-10; FTI Consulting, *Memorandum Re: Direct to Consumer Earned Wage Access User Survey Key Findings*, at 2 (July 7, 2021) (commissioned by Brigit, MoneyLion, & EarnIn), https://perma.cc/WV45-J38C. Other studies show that EWA helps customers prepare for emergencies. For instance, in one study of customers of EarnIn (an EWA provider), 50 percent of participants reported that using EarnIn's services would allow them to afford a $400 emergency that they previously could not have covered. *See* EarnIn, *Comment re: 2024 Paycheck Advance Interpretive Rule*, Dkt. CFPB-2024-0032, at 2 (Aug. 30, 2024), https://bit.ly/4sQSfhx. Thus, while EWA cannot solve the problem of income insufficiency, it helps consumers better manage it by enabling access to the money they have already earned.

EWA also helps consumers gain control over their personal finances by avoiding late fees, penalties, and interest rates. Studies show that about half of current EWA users previously had to pay their bills late (and incur late fees) before they had access to EWA. Leslie Parrish, *DailyPay Use and Outcomes: A Summary of Survey Findings*, Aite-Novarica Group, at 3 (Aug. 2021) (commissioned by DailyPay), https://perma.cc/H984-KLU5; FTI Consulting, *supra* at 3. Many EWA customers also report that before using EWA, they paid their expenses by overdrafting their bank accounts or using payday loans. Parrish, *supra* at 3; FTI Consulting, *supra* at 3. A significant percentage of EWA customers report that EWA enables them to cover their expenses without resorting to those higher-cost options. Parrish, *supra* at 4.

EWA users also report broad improvements in quality of life. In a recent study involving 5,000 national EWA customers, 93 percent stated that they felt a greater sense of financial control after using EWA. *See* FTI Consulting, *supra* at 2. In the same study, 82 percent of participants reported feeling less stressed about their financial situation and 77 percent noticed improvements in their mental health. *Id.*

### B. EWA Services Are Fundamentally Distinct from Payday Loans and Other Credit Products

1. Before EWA, consumers who could not afford to pay bills or other short-term expenses often had to resort to credit. Those with sufficient credit scores could use credit cards. Instant Financial, *Wages and Wellbeing: Analyzing the*

*Impact of Same-day Pay*, at 7 (2022), https://perma.cc/2CCQ-7Z9V. But credit-card balances revolve and accrue interest, often at high rates, and many people who need short-term liquidity are not eligible for credit cards in the first place. Lux, *supra* at 8. Alternatively, consumers could overdraft their bank accounts. *Id.* at 9. But some banks charge per-transaction overdraft fees as high as $34. *Id.*

In the 1990s, payday loans became a popular option for lower-income workers who could not obtain credit elsewhere. *See* Bersin, *supra* at 4. Payday loans typically are for $500 or less and require consumer repayment within a two-week period. Lux, *supra* at 8. Because people who need payday loans pose a significant risk of default, payday lenders charge high fees to compensate for this risk— according to one estimate, the average fees for a two-week loan can result in an annual percentage rate (APR) of over 400 percent. *Id.* Many payday lenders also allow borrowers to rollover their unpaid debt by extending their repayment period or refinancing their loans for an additional fee. *See* Bersin, *supra* at 4.

These high baseline fees and rollovers trap many payday borrowers in debt cycles, where they must continue borrowing additional funds and paying additional interest and fees. According to one study, a worker who takes out a $375 payday loan typically incurs $520 in fees. The Pew Charitable Trusts, *Payday Loan Facts and the CFPB's Impact*, at 1 (May 2016), https://perma.cc/Y92L-S536. More broadly, the CFPB has found that about 80 percent "of payday loans are rolled over

10

or followed by another loan" before the two-week repayment period expires. CFPB, Office of Research, *CFPB Data Point: Payday Lending*, at 4 (Mar. 2014), https://perma.cc/SNJ6-AXRN. About 15 percent of new borrowers end up rolling over at least 10 payday loans before they fully repay. *Id.*

Many individuals end up rolling over payday loans to avoid the harmful consequences of defaulting. Lenders often sell defaulted payday loans to debt collectors, who may engage in aggressive collection practices or report the debt to major credit reporting companies (thereby damaging the borrowers' credit score). CFPB, *Can Taking Out a Payday Loan Help Rebuild My Credit or Improve My Credit Score?* (Nov. 25, 2024), https://perma.cc/GA3Q-SKAJ. Lenders and debt collectors may also bring lawsuits to collect defaulted loans and seek to garnish borrowers' wages. Losing a lawsuit related to an unpaid payday loan can further damage a borrower's credit score. CFPB, *Can a Payday Lender Garnish My Bank Account or My Wages if I Don't Repay the Loan?* (Nov. 25, 2024), https://perma.cc/PXE2-XC4N.

2.    In contrast, EWA, which is not a loan, allows workers to obtain short-term liquidity while avoiding the risks presented by loans. Most significantly, customers do not promise to repay EWA providers and cannot rollover or refinance transfers; correspondingly, EWA providers expressly waive any right to collect unpaid transfers and impose no financial penalties on customers for nonpayment.

11

Nor do EWA providers sell unpaid transfers to third parties like debt collectors. While many EWA providers offer expedited delivery of EWA transfers for a fee, that delivery method is optional—a user can choose free standard delivery (usually between 1-4 days through automated clearing house), which is convenient and faster than waiting for the next employer-mandated payroll day.

That combination of features means that, by design, EWA users cannot end up in the cycle of debt that characterizes payday loans and other credit products. *See* Alliance for Innovative Regulation, *Earned Wage Access: Exploring Policy Implications & Frameworks*, at 12 (2024), https://perma.cc/LYR7-P2KR. The funds customers receive represent their actual earned wages. There are no ballooning costs, no debt collectors, and no lawsuits. *See id.* And customers face no financial harms if they choose to walk away after receiving an EWA transfer. *See id.* If an EWA provider then declines to offer *future* transfers upon nonpayment, that does not impose an obligation or liability upon a consumer to repay any outstanding proceeds already in their possession.

3. Because EWA is not credit, it has clear advantages over payday loans and other credit products. As a result, more than ten million consumers now use EWA services, and as of 2022, EWA facilitated earned wage transfers totaling $31.9 billion. *See* 90 Fed. Reg. 60069, 60070 (Dec. 23, 2025). Employers are also increasingly using EWA services to attract and retain talent. *See* Bersin, *supra* at 3.

12

Indeed, according to one recent study, 60 percent of employees said that they would switch jobs if they had more flexibility to select pay frequency, same-day pay, or early access to pay. *See* Bersin, *supra* at 3.

The growing popularity of EWA is especially pronounced among people who have previously used payday loans. According to a study conducted by researchers at the Harvard Kennedy School, 70 percent of EWA users indicated that they have stopped using payday loans or now use them less. Lux, *supra* at 23. In a similar study conducted by a market research firm, 81 percent of participants reported that they had stopped using payday loans entirely after using EWA; and 15 percent reported that they had reduced use of payday loans. *See* Parrish, *supra* at 4. At bottom, consumers understand that EWA is better suited to their needs and have expressed that understanding through their choices in the market.

## II. FEDERAL COURTS SHOULD NOT DISRUPT THE ONGOING, NATIONWIDE EWA POLICYMAKING PROCESS

Existing lending laws seek to protect consumers from the risks posed by loans and other credit products. Although the specifics vary, many States require lenders to obtain licenses and have established maximum interest rates for loans. *See* Conference of State Bank Supervisors, *50-State Survey of Consumer Finance Laws* (Nov. 19, 2020), https://perma.cc/JZ63-MLT9. At the federal level, TILA requires all "creditor[s]" who extend "consumer credit" that has a finance charge or more than four installments to disclose key transaction terms, including any finance

charges, the repayment date, and the APR, subject to limited exceptions. *See* 15 U.S.C. §§ 1631, 1638. Additionally, the MLA regulates the APR that creditors can charge to military servicemembers. 10 U.S.C. § 987.

Policymakers at every level have recognized that these existing laws are a poor fit for EWA. The statutes use terms—like "creditor," "lender," "debt," "interest," and "loan"—that do not describe EWA. And the statutes would subject EWA to burdensome restrictions even though EWA does not pose the risks the statutes seek to address. Accordingly, States, Congress, and the CFPB are undertaking efforts to establish new regulatory frameworks for the EWA industry that provide tailored consumer protections recognizing the unique, non-credit features of the product.

This Court should not undermine that policymaking process by declaring that ill-fitting federal lending laws apply to EWA. Rather than force EWA providers to comply with inapposite statutory schemes, the Court should allow the policymaking process to continue.

**A. States, Congress, and the CFPB Are Currently Engaging in a Robust Policymaking Process Around EWA**

1. Many state legislatures across the Nation have recognized that their existing lending laws do not apply to EWA—or at least are ambiguous as to their application. Over the last several years, 32 States have either enacted or proposed

laws specifically addressing EWA.  *See* Appendix of State Laws and Bills (Ex. A hereto).

In 2023, Nevada enacted the Nation's first EWA-specific law, which authorizes EWA providers to operate in the State if they obtain an EWA-specific license.  *See* Nev. Rev. Stat. §§ 604D.160, 604D.200.  The law makes clear that a company qualifies as an EWA provider only if its service abides by requirements that distinguish EWA from credit products.  For example, the provider may not charge a late fee, interest, or other penalty if a customer fails to repay a transfer; report any information about customers to a consumer reporting agency or debt collector; or attempt to compel customers to repay transfers through a civil action or otherwise.  *Id.* § 604D.410.  Accordingly, if the provider satisfies those requirements, among others, then its EWA services are not a "loan or other form of credit."  *Id.* § 604D.190.  After Nevada's Republican Governor signed the law, the leader of the Nevada Assembly's Democratic Majority explained that EWA services are "crucial for expanding financial access and inclusion," emphasizing that Nevada was "leading by example to provide tangible progress on workers' rights."  Alex Clere, *What Nevada's Pioneering Earned Wage Access Law Really Means*, FinTech Magazine (June 26, 2023), https://perma.cc/F9FR-9A62.

Since Nevada enacted its law, seven other States have passed similar legislation specifying that *bona fide* EWA services—*i.e.*, those with no legal

15

obligation to repay and no penalties for nonpayment—are not "loans" or "credit" under existing lending laws. *See* Ark. Code § 23-52-203; Ind. Code § 28-8-6-1002; Kan. Stat. § 9-2407; La. Stat. § 9:3591.5; Mo. Stat. § 361.749; S.C. Code § 39-5-860; Utah Code § 13-78-106. In addition, certain state Attorneys General have issued opinions determining that existing lending laws do not apply to EWA because it is not credit and because optional expedited-delivery fees are not finance charges. Mark Brnovich, Attorney General of Arizona, Opinion No. I22-005: Earned Wage Access Products, at 11 (Dec. 16, 2022) ("Ariz. AG Op."), https://perma.cc/FD6N-XSDL; Austin Knudsen, Attorney General of Montana, 59 Att'y Gen. Op. 2, at 1902-03 (Dec. 22, 2023) ("Mont. AG Op."), https://perma.cc/Q6Q3-ANSD.[2]

2.    Members of Congress from both parties have likewise recognized the need for legislation tailored to EWA services. Most recently, on January 12, 2026, Republican Congressman Bryan Steil (from Wisconsin) and Democratic Congressman Ritchie Torres (from New York) released a discussion draft of a bill entitled "The Earned Wage Access Consumer Protection Act." FTA, *FTA Applauds Release of Bipartisan Earned Wage Access Legislation* (Jan. 13, 2026), https://perma.cc/C9DE-ZNY7; *see* The Earned Wage Access Consumer Protection

---

[2] Even the single State in this Circuit (California) that has labeled EWA a "loan" has recognized that its existing consumer lending law is incompatible with EWA. It therefore exempted EWA from many sections of that law and created requirements tailored to EWA. *See* Cal. Code Regs. tit. 10, § 1461(e).

Act, H.R. ---, 119th Cong. (2026) (the Act). The Act, which builds on similar federal legislation introduced in 2024, *see* Earned Wage Access Consumer Protection Act, H.R. 7428, 118th Cong. (2024), would require that all EWA services offer certain features, including a free version of the service, a cancellation option, and a waiver of the provider's right to seek recovery of transfers from consumers or to charge them interest or penalties. Act § 2(a). These provisions ensure that EWA retains its non-loan nature. For EWA services that satisfy those requirements, the draft federal bill would confirm that TILA does not apply, *id.* § 3(b), and preempt application of any inconsistent state laws, *id.* § 2(d).

The CFPB, which administers TILA, *see* 15 U.S.C. § 1604(a), also recently issued an Advisory Opinion confirming that TILA ordinarily does not apply to EWA for multiple reasons, while noting that it "continues to seek stakeholder feedback and evaluate whether it should take further legal steps with respect to EWA," 90 Fed. Reg. at 60071. In December 2020, the CFPB confirmed that "Covered EWA Transactions"—*i.e.*, transfers of earned wages by employer-based EWA services that satisfy certain other criteria—are not "credit" under TILA or its implementing regulations. *See* 85 Fed. Reg. 79404, 79406 (Dec. 10, 2020). For a brief period, the CFPB released a proposed interpretive rule pertaining to EWA and rescinded its December 2020 Opinion. *See* 90 Fed. Reg. 3622 (Jan. 15, 2025). Following that blip, the CFPB rescinded the proposed interpretive rule and restored and expanded

17

its opinion that "Covered EWA" services (as defined in the 2025 Advisory Opinion) are not "credit." 90 Fed. Reg. at 60071-72. Importantly, the 2025 Advisory Opinion emphasizes that "debt" means "a financial liability or obligation owed by one person, the debtor, to another, the creditor." *Id.* at 60071.

The 2025 Advisory Opinion further concludes that, as to *all* EWA services (both employer-based and direct-to-consumer), optional expedited-delivery fees are not "finance charges" under TILA and its implementing regulations. *Id.* at 60074-76. As a result, even if a given EWA service were deemed to be "credit," it still would not be subject to TILA to the extent any expedited-delivery fees are optional. *See* 12 C.F.R. § 1026.1(c)(1)(iii) (requiring that "credit" also have a finance charge or more than four installments for it to be subject to TILA).

These developments underscore the growing consensus that EWA is not credit, as well as the substantial ongoing efforts to design a sensible regulatory system tailored to EWA. Ultimately, it should be up to States and the political branches to craft that new regime with input from stakeholders.

**B. Courts Should Not Apply Outdated Federal Laws to New EWA Services**

1. Rather than allow the democratic policymaking process to play out, some federal district courts—including the court below—have attempted to shoehorn EWA services into TILA and the MLA. Those attempts should be rejected: the relevant text and context make clear that TILA and the MLA apply only

to products that (unlike EWA) involve both a "debt"—*i.e.*, a legal obligation to repay a sum of money—and finance charges.

a. Here, the district court first erroneously held that the EWA provider at issue (Grant Money) extends "credit." *Revell*, 2025 WL 3167318, at *10; *see Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935-37 (N.D. Cal. 2025) (same). Under TILA and the MLA, "credit" means "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f); *see* 32 C.F.R. § 232.3(h) (similar). While the statutes and regulations do not define "debt," the meaning of that term is unambiguous. Common dictionaries define it as "being under *obligation* to pay or repay someone or something in return for something received." *Debt*, Merriam-Webster.com Dictionary, https://perma.cc/N44F-24EF (last visited Feb. 3, 2026) (emphasis added). Legal dictionaries define it as "*[l]iability* on a claim; a specific sum of money *due* by agreement or otherwise." *Debt*, Black's Law Dictionary (12th ed. 2024) (emphases added). Other federal statutes define it as "any *obligation* or alleged obligation of a consumer to pay money." 15 U.S.C. § 1692a(5) (emphasis added). And the CFPB recently explained that "the common meaning of debt is . . . a financial *liability* or *obligation* owed by one person, the debtor, to another, the creditor." 90 Fed. Reg. at 60071 (quoting *Debt*, Black's Law Dictionary (4th ed. 1968) (emphases added)).

19

Under the term's plain meaning, users of EWA services like Grant Money's incur no "debt." As already explained, EWA users have no obligation to repay a transfer, and EWA providers also expressly waive any contractual or legal right to collect an unpaid transfer. *See Revell*, 2025 WL 3167318, at *2. Grant Money's user terms make this limitation clear: They specify that Grant Money has "no legal or contractual claim" against customers "based on a failure to repay." ER-99. Instead, the only effect of nonpayment is that a user cannot obtain another transfer until he repays the current one. Accordingly, a user never has any legal obligation to repay a transfer. And absent such a legal obligation, a user is not in "debt" to a provider.

The district court's contrary reasoning is unsound. The court suggested that a Grant Money consumer is in "debt" merely because he authorizes Grant Money to "debit[]" his bank account "upon receipt of [his] next paycheck." *Revell*, 2025 WL 3167318, at *10. But where, as here, consumers can unilaterally revoke the payment authorization and stop that collection with no financial consequences—by emailing customer service—there clearly is no *obligation* to repay and thus no debt. *See* ER-100.[3] If it were otherwise, then every consumer would be "indebted" to every

---

[3] The district court asserted that Grant Money customers were required to "consent to mandatory debits." *Revell*, 2025 WL 3167318, at *10. But Grant Money permits customers to "revoke" their "credit and debit authorization" by emailing customer support, and customers may "prevent a scheduled debit from occurring" by emailing

20

business with which he has autopay enabled—from gyms to video streaming services—even though the consumer can cancel the future payment and disable the autopay.

The district court's reliance on Federal Reserve staff commentary concerning "deferred presentment" transactions was misplaced. *Revell*, 2025 WL 3167318, at *7; 12 C.F.R. pt. 1026 Supp. I 2(a)(14) Credit ¶ 2. The court failed to recognize that those transactions are fundamentally distinct from Grant Money's EWA service because they involve *irrevocable* debit authorizations—and thus create an obligation to repay. By contrast, as already explained, Grant Money allows customers to revoke their debit authorization before any payment is debited. The Federal Reserve staff commentary never considers the type of *revocable* debit authorization at issue here.

The district court further implied that a consumer can incur debt even without having a "*legal* obligation to repay." *Revell*, 2025 WL 3167318, at *10. But in the context of a consumer transaction, it makes no sense to conceive of an obligation to repay as something other than legal in nature. Absent a contractual term requiring repayment, what is the basis for the obligation? The district court did not say. Indeed, recall that "debt" is defined to mean "[*l]iability* on a claim." *Debt*, Black's

---

"at least three (3) business days before the date on which the debit is scheduled to occur." ER-100.

Law Dictionary (12th ed. 2024) (emphasis added).  And in turn, "liability" means "the quality, state, or condition of being *legally obligated* or accountable" or "*legal responsibility* to another or to society, enforceable by civil remedy or criminal punishment." *Liability*, Black's Law Dictionary (12th ed. 2024) (emphases added). The critical point is clear: a person incurs "debt" only if he has a legal obligation to repay a sum of money; and EWA entails no such obligation.

The district court additionally erred in citing this Court's unpublished, nonprecedential disposition in *Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025).  There, the Court interpreted a specific provision of Washington law that defined "reverse mortgage loan" to include even "nonrecourse" obligations. *Id.* at *3 (citation omitted).  But the Court recognized that "in other contexts"—where the relevant statute did not contain such an idiosyncratic definition—the term "loan" could include the "essential ingredient of an *obligation* to make future payments." *Id.*  In any event, the lender in *Olson* could force repayment through a deed of trust on the borrower's home. *See id.* at *1-*2. As the Court explained, "[t]he deed thus *does* secure all of the payments that [the lender] expects in the future in order to recoup the value of its $64,750 advance, including a potential payment . . . that specifically cannot be less than the $64,750 initial payment." *Id.* at *4.  By contrast, with EWA services like Grant Money's, customers fully control repayment, and the provider does not hold any collateral.

22

b.      The district court also erroneously held that Grant Money's "expedite fees" are "finance charges." *Revell*, 2025 WL 3167318, at *12; *see Orubo*, 780 F. Supp. 3d at 936-38. Under both TILA and the MLA, the definition of "finance charge" includes only charges "*imposed* directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added); *see* 15 U.S.C. §1605(a) (similar); 32 C.F.R. § 232.3(n) (cross-referencing definition in 12 C.F.R. § 1026.4(a)). "Impose" means "to establish or apply by authority." *Impose*, Merriam-Webster.com Dictionary, https://perma.cc/964W-Q5TX (last visited Feb. 3, 2026); *see United States v. Martin*, 974 F.3d 124, 138 (2d Cir. 2020) (citing various dictionaries). Thus, a charge is "imposed . . . by the creditor" only if the putative creditor applies the charge by authority—*i.e.*, *requires* it—in order for the consumer to obtain the extension of credit. Because EWA expedited-delivery fees like Grant Money's "expedite fees" are entirely optional, they cannot constitute "finance charges" for purposes of TILA and the MLA. As the CFPB recently explained, "in the normal course, expedited delivery fees associated with EWA are not finance charges" because "they are not 'directly or indirectly imposed' by the provider," but rather "triggered by the consumer's opting for expedited delivery." 90 Fed. Reg. at 60075 (quoting 12 C.F.R. § 1026.4(a)).

Again, the district court's contrary reasoning lacks merit. Most glaringly, the court never grappled with the key phrase—"imposed . . . by the creditor"—and thus never explained how that language could apply to an optional fee voluntarily paid by the customer. Nor did the court address—much less distinguish—the most persuasive authority on whether optional fees are finance charges: The Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996), which correctly held that a fee one "can choose to avoid"—there, an express mail charge for faster shipping—is "not *imposed* as an incident to [an] extension of credit." *Id.* at 579 (emphasis added).

The district court also misunderstood the phrase "incident to." The Supreme Court has specifically construed "incident to" within TILA to "impl[y] some *necessary* connection between the antecedent and its object." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 240-41 (2004). Here, there is no necessary connection between expedited-delivery fees, on the one hand, and EWA transfers, on the other, because a customer can obtain a transfer without paying any fee. While the district court quoted *Pfennig*'s "*necessary* connection" formulation, it then applied a different test—whether an instant transfer is "a material term" of the product—that has no foundation in the relevant statutory or regulatory text. *Revell*, 2025 WL 3167318, at *11 (citation omitted).

2.      It is unsurprising that TILA and the MLA do not apply to EWA.  After all, Congress enacted those statutes in a different era to address a different type of product: loans.  That focus is clear from the face of both statutes.  Their central provisions address hallmark components of loans—most notably, mandatory repayment terms and interest (including APR).  The MLA, for instance, regulates "creditors" by: (1) prohibiting them from requiring servicemembers to "pay interest" except under certain terms; (2) barring them from "impos[ing] an annual percentage rate of interest greater than 36 percent"; and (3) requiring them to disclose certain information, including a "statement of the annual percentage rate of interest."  10 U.S.C. §§ 987(a)-(c).  Similarly, TILA seeks to enable consumers to compare credit products by requiring "creditors" to disclose credit terms, including the product's "annual percentage rate" and the "number, amount, and due dates or period of payment." 15 U.S.C. §§ 1601(a), 1638(a)(4), (6).  Those provisions cannot plausibly apply to EWA, which involves no interest, finance charges, or obligation to repay.

The same is true of TILA's implementing regulation, Regulation Z.  For example, Regulation Z provides that the "term" of a given transaction must be considered when calculating APR.  *See* 12 C.F.R. § 1026.22(a)(1) (cross-referencing "appendix J to this part" for rate-calculation instructions); 12 C.F.R. pt. 1026, App. J §§ (b)(2), (c).  And the relevant "term ends on the date the last payment is due."

25

*Id.* § (b)(2). But no payments for EWA transfers ever become "due" at all because they provide already-earned wages, and there is no legal obligation to repay.

In fact, requiring EWA providers to make inapposite TILA disclosures would create significant consumer confusion. Studies show that consumers generally understand that EWA services involve payments of "wages they had already earned," rather than "loans." AFC Comment, *supra* at 20 (quoting Lisa Berdie et al., *Exploring Earned Wage Access as a Liquidity Solution*, Financial Health Network, at 5 (Nov. 2023), https://perma.cc/3C3H-ACVK). Against that backdrop, mandating TILA disclosures by EWA providers would only mislead consumers into thinking that they have an obligation to repay an EWA transfer or to pay interest on the transfer. For instance, because EWA providers would have to label a transfer as the "amount financed," 12 C.F.R. § 1026.18, a reasonable EWA customer reading such a disclosure could easily assume that he had agreed to interest rates or other fees. And if a consumer receives TILA disclosures from actual lenders—*e.g.*, a mortgage lender—the consumer could become confused about why the EWA disclosure lacks most of the "required" information regarding rates and repayment terms included in those other disclosures. Thus, applying TILA to EWA services would directly undermine TILA's purpose: facilitating "the informed use of credit" and enabling comparison of credit terms. 15 U.S.C. § 1601(a).

To be clear, *amici* welcome sensible, pragmatic regulation of EWA. But to achieve that aim, the answer is not to impose an inapposite regulatory regime designed for fundamentally different products (loans). Instead, it is to allow States, Congress, and the CFPB to establish new frameworks tailored to this new product, with input from EWA providers, consumers, and other stakeholders.

Yet an adverse decision from this Court would stymie the ongoing efforts to do just that. It would create a conflict between federal law and state laws in this Circuit—like Nevada's, Montana's, and Arizona's—that define EWA as distinct from loans. *See* Nev. Rev. Stat. Ann § 604D.190(1); Ariz. AG Op., *supra* at 1; Mont. AG Op., *supra* at 1897. And it could undermine the policymaking processes in three additional States within this Circuit—Idaho, Oregon, and Washington—where state legislators have recently introduced EWA legislation. *See* S.B. 1119, 68th Leg., 1st Reg. Sess. (Idaho 2025); H.B. 2131, 83rd Leg., 2025 Reg. Sess. (Or. 2025); S.B. 53-28, 69th Leg., 2025 Reg. Sess. (Wash. 2025) (reintroduced Jan. 12, 2026). The Court should instead recognize that preexisting federal lending laws do not apply to EWA and permit the democratic policymaking process to run its natural course.

## III. AFFIRMING THE DECISION BELOW WOULD UPEND THE EWA INDUSTRY AND HARM CONSUMERS

A decision affirming the district court's ruling would radically disrupt the EWA industry and the lives of workers within this Circuit who rely upon EWA. Applying federal lending laws to EWA would seriously jeopardize, if not eliminate,

the core features of EWA—thereby constraining consumer choice and access to EWA's benefits.

To begin, if this Court holds that EWA constitutes "credit" under federal law, increased compliance and regulatory costs will materially change the economics of offering EWA services. To adapt to these changes, EWA providers will be pressured to abandon the product's consumer-friendly, non-credit features and adopt typical lending practices, including charging periodic interest, imposing late fees, running credit checks, obtaining repayment obligations from consumers, and undertaking related debt collection efforts. AFC Comment, *supra* at 8-9. In all likelihood, the no-repayment-obligation and optional-fee features of EWA—*i.e.*, the very characteristics of EWA that differentiate it from credit that is subject to TILA and the MLA—would thus cease to exist.

Even if some EWA providers attempt to maintain their services' core characteristics, compliance with inapposite lending laws may make it difficult for them to continue operating or to distinguish themselves from lenders in the market. As already explained, inapt disclosure requirements may mislead consumers into conflating EWA and loans—thus eliminating their ability to compare products and make an informed choice about whether EWA is better suited to their needs.

The impact on the EWA industry would be significant. If courts apply federal lending laws to EWA, smaller EWA providers may be forced out of business. *See*

28

AFC Comment, *supra* at 9. Many of *amici*'s members are small businesses for whom increased compliance costs—including expenses to develop new technology and to hire additional staff—would be too great to bear. *See id.* Increased regulatory burdens would also heighten barriers to entry for new providers, thereby suppressing competition and innovation.

Absent a robust EWA market, consumers will largely be left with the expensive short-term liquidity options that existed before EWA: credit cards, overdraft programs, and payday loans. One study showed that without EWA, 44 percent of current EWA customers would consider not paying bills on time; 38 percent would consider overdrafting; and 35 percent would consider a payday loan. AFC Comment, *supra* at 21 & n.96. Misclassifying EWA services as loans would thus likely drive consumers to higher-cost, short-term credit products that carry greater risks, including negative credit reporting, rollovers, debt collection, and lawsuits. *See id.* at 21 & n.95.

The harms would be heightened for the most vulnerable consumers. Because EWA services do not require credit checks, even consumers with low or no credit— who are often excluded from other forms of financial services—may still use EWA. *See id.* And because EWA simply provides access to an asset—earned but unpaid income—a consumer's creditworthiness is irrelevant. If EWA were misclassified as credit, EWA customers would become subject to credit underwriting, leaving some

29

unable to qualify for borrowing. *Id.* at 21. Yet those individuals will still need funds to pay for basic needs, from food, to transportation, to utilities. These consumers will therefore be driven back to alternatives like payday loans—with the attendant higher costs and risks.

These consequences are not merely hypothetical. States that have classified EWA providers as lenders have already felt the effects of that decision. After Connecticut imposed certain lending regulations on EWA providers, for instance, many EWA providers exited the state market, including nearly all direct-to-consumer providers. *See* Kerri M. Raissian et al., *Connecticut Earned Wage Access User Impact Study*, at 3 (Univ. Conn. 2025) (commissioned by DailyPay), https://perma.cc/5RZM-YVDM. In a study conducted by the University of Connecticut after the State's policy change, participants who had previously relied on EWA "reported that they were forced to go without something they needed, put expenses on a credit card, borrow from friends and family, sell items of value, or set up a payment plan." *Id.* at 4. To prevent a similar result within this Circuit, this Court should apply the plain meaning of the statutory and regulatory text and hold that federal lending laws do not govern EWA.

## CONCLUSION

The Court should reverse the district court's order.

30

Dated: March 6, 2026          Respectfully submitted,

*/s/ Ephraim A. McDowell*

James Kim                      Ephraim A. McDowell

Dana N. Levin                 Elias S. Kim

COOLEY LLP                 Jade Ford[*]

55 Hudson Yards             COOLEY LLP

New York, NY 10001-2157    1299 Pennsylvania Avenue, N.W.

Telephone: (858) 550-6000   Washington, DC 20004-2400

Telephone: (202) 842-7800

emcdowell@cooley.com

*Counsel for Amici Curiae*

---

[*] Admitted to practice in New York only. Not admitted to practice in Washington, DC. Supervised by active members of the Washington, DC Bar.

31

## CERTIFICATE OF COMPLIANCE

I, Ephraim A. McDowell, counsel for *amici curiae* American Fintech Council and Financial Technology Association and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32 and Ninth Circuit Rule 32, that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 7,000 words.

/s/ *Ephraim A. McDowell*
Ephraim A. McDowell
COOLEY LLP

*Counsel for Amici Curiae*

March 6, 2026

## CERTIFICATE OF SERVICE

I, Ephraim A. McDowell, counsel for *amici curiae* American Fintech Council and Financial Technology Association and a member of the Bar of this Court, certify that, on March 6, 2026, this brief was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ *Ephraim A. McDowell*
Ephraim A. McDowell
COOLEY LLP

*Counsel for Amici Curiae*

March 6, 2026