No. 25-7035

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

JOHN REVELL, individually, on behalf of all others similarly situated, and on behalf of the general public,

*Plaintiff-Appellee*,

v.

GRANT MONEY, LLC, a Delaware corporation doing business as Grant; KIKOFF, INC., a Delaware corporation,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-5994-TLT (Hon. Trina Thompson)

# APPELLANTS' REPLY BRIEF

Benjamin W. Snyder
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
(202) 551-1700

Matthew P. Previn
Ben Gifford
Margaret Shields
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(312) 318-6000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The MLA Bars Mandatory Arbitration Agreements, Not Optional Ones. .......... 2

II. Defendants' Cash Advances Are Not Credit. .......... 6

- A. Debt Requires a Legal Obligation to Repay. .......... 6
- B. The CFPB's Advisory Opinion Supports Defendants. .......... 12
- C. Revell's Remaining Arguments Fail. .......... 14

III. Defendants Do Not Impose Finance Charges. .......... 17

- A. Defendants Do Not "Impose" Expedite Fees. .......... 18
- B. Expedite Fees Are Not "an Incident to or a Condition of the Extension of Credit." .......... 20
- C. Expedite Fees Are "of a Type Payable in a Comparable Cash Transaction." .......... 24
- D. It Is Undisputed That Cash Advances Are Not Consumer Credit When Users Choose Not to Expedite Delivery. .......... 26

IV. At Minimum, Revell's TILA and GPLA Claims Are Arbitrable. .......... 27

CONCLUSION .......... 29

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Aetna Life Ins. Co. v. Town of Middleport*,
124 U.S. 534 (1888) .......... 8

*Alexander v. Carrington Mortg. Servs., LLC*,
23 F.4th 370 (4th Cir. 2022) .......... 22

*American Textile Mfrs. Inst., Inc. v. Ltd., Inc.*,
190 F.3d 729 (6th Cir. 1999) .......... 8

*Cent. Freight Lines, Inc. v. Amazon Fulfillment Servs.*,
861 F. App'x 154 (9th Cir. 2021) .......... 8

*CFPB v. Snap Fin. LLC*,
No. 2:23-cv-462, 2024 WL 3625007 (D. Utah Aug. 1, 2024) .......... 9

*Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*,
514 U.S. 122 (1995) .......... 16

*Espin v. Citibank, N.A.*,
126 F.4th 1010 (4th Cir. 2025) .......... 28

*FAA v. Cooper*,
566 U.S. 284 (2012) .......... 3

*Feeman v. Bridge It, Inc.*,
No. 25-cv-3806, 2026 WL 880508 (S.D.N.Y. Mar. 30, 2026) .......... 15

*Gilman v. Comm'r*,
53 F.2d 47 (8th Cir. 1931) .......... 15

*Glover v. Ocwen Loan Servicing, LLC*,
127 F.4th 1278 (11th Cir. 2025) .......... 22

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004) .......... 20, 21, 24

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 12

*Pa. Dep't of Pub. Welfare v. Davenport*,
495 U.S. 552 (1990) .......... 14, 15

*Perry v. United States*,
294 U.S. 330 (1935)..........15

*Thompson v. Comm'r*,
235 F.2d 599 (9th Cir. 1956)..........15

*United States v. Fort Scott*,
99 U.S. 152 (1879)..........8

*Veale v. Citibank, F.S.B.*,
85 F.3d 577 (11th Cir. 1996)..........22

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010)..........25

*Yates v. United States*,
574 U.S. 528 (2015)..........5

**STATUTES**

10 U.S.C. § 987..........*passim*

11 U.S.C. § 727..........7

15 U.S.C. § 1602..........9

26 U.S.C. § 61..........7

42 U.S.C. § 7413..........5

Ark. Code Ann. § 23-52-202..........19

Kan. Stat. Ann. § 9-2402..........19

S.C. Code Ann. § 39-5-820..........19

Utah Code Ann. § 13-78-101..........19

**REGULATIONS**

12 C.F.R. § 226.2 (2007)..........12

12 C.F.R. § 226.4 (1996)..........24

12 C.F.R. § 1026.2..........9

12 C.F.R. § 1026.4..........*passim*

32 C.F.R. § 232.3..........17

61 Fed. Reg. 49237 (Sept. 19, 1996)..........18, 21

65 Fed. Reg. 17129 (Mar. 31, 2000)..........11

68 Fed. Reg. 16185 (Apr. 3, 2003)..........23

72 Fed. Reg. 16185 (Aug. 31, 2007)....................12
80 Fed. Reg. 43560 (July 22, 2015)....................12
90 Fed. Reg. 60069 (Dec. 23, 2025)....................13, 18, 22

**RULE**

Fed. R. Evid. 201....................25

**OTHER AUTHORITIES**

152 Cong. Rec. H8061 (daily ed. Sept. 29, 2006)....................4

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)....................7

CFPB, How Do I Stop Automatic Payments from My Bank Account?, https://perma.cc/Z7P9-LFER....................16

Dep't of Def., *Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (Aug. 9, 2006), https://perma.cc/NAC5-D97H....................4, 17

*Obligation*, Black's Law Dictionary (12th ed. 2024)....................6, 7

## INTRODUCTION

Defendants give users the ability to take out modest cash advances that they have no obligation to repay. Because the advances do not create debt, they are not credit. And even if the advances were credit, they would not be "consumer credit" within the meaning of the Military Lending Act ("MLA"), because they are not subject to finance charges: While users can choose to pay an expedite fee to receive an advance more quickly, they can receive the same advance without paying the fee, and the fee is materially identical to fees that users regularly pay for cash transfers and withdrawals. The MLA therefore provided no valid basis for disregarding the optional arbitration agreement that Plaintiff John Revell chose to accept.

Revell's contrary arguments are unpersuasive. He asserts that the MLA bars enforcement of *all* arbitration agreements, but has to concede that Congress prohibited only *mandatory* agreements, and cannot explain why Congress would go out of its way to allow optional agreements only to then render them unenforceable. He contends that Defendants' cash advances are "credit," but defines that term in an implausibly broad way that conflicts with longstanding interpretations across a range of related legal contexts. And while he argues that optional fees paid to expedite delivery are "finance charges," he cannot reconcile that argument with statutory text, governing precedent, or recent guidance from the Consumer Financial Protection Board ("CFPB"). Finally, even if his arguments under the MLA had merit, Revell

fails to explain why the MLA should prevent arbitration of claims under other statutes.

Congress adopted the MLA to protect servicemembers and their dependents from abusive financial products that can ruin credit and lead to snowballing debt. But Defendants' non-recourse advances, which do not affect their users' credit and leave their users with no debt, do not implicate that concern. Indeed, Defendants' advances give servicemembers a way to avoid the very abuses that Congress aimed to prevent. This Court should accordingly reverse and remand with instructions to enforce the parties' contract (including its optional arbitration provision) according to its agreed-upon terms.[1]

## ARGUMENT

### I. The MLA Bars Mandatory Arbitration Agreements, Not Optional Ones.

Section 987(e)(3) of the MLA imposes a limitation on creditors: They may not "require[] [a] borrower to submit to arbitration." Section 987(f)(4) sets a penalty for violating that limitation: offending agreements will not "be enforceable against any covered member or dependent." Because Defendants did not require Revell to

[1] Revell briefly asserts (at 4-5) that if he is right that the MLA prohibits enforcement of the arbitration agreement, then this Court lacks appellate jurisdiction. For the reasons explained in the opening brief and the remainder of this reply, however, the MLA does not prohibit enforcement of the arbitration agreement, so Revell's jurisdictional argument fails on its own terms.

submit to arbitration, they did not violate Section 987(e)(3) and are not subject to the penalty set forth in Section 987(f)(4).

Revell argues (at 23) that Section 987(f)(4) bars enforcement of *all* arbitration agreements—even optional ones—because Congress did not expressly single out "mandatory" agreements or agreements "that violate[] Section 987(e)(3)" as being unenforceable. As the Supreme Court has recognized, though, "Congress need not state its intent in any particular way" for that intent to be clear. *FAA v. Cooper*, 566 U.S. 284, 291 (2012). And it is clear from the MLA's structure that Section 987(f)(4) sets forth a penalty for violating Section 987(e)(3), rather than banning optional arbitration agreements.

Revell resists that straightforward interpretation, arguing (at 22-25) that Sections 987(e)(3) and 987(f)(4) serve different purposes. According to Revell, Section 987(f)(4) preserves a judicial forum for all other Section 987(e) violations that a plaintiff might allege, whereas Section 987(e)(3) "shows Congress considered mandatory arbitration clauses so pernicious that including them should expose creditors to criminal fines, imprisonment, and statutory damages." Br. 24. Revell fails to explain, though, why Congress would have viewed mandatory arbitration

clauses as more "pernicious" than optional ones if, as he contends, both types of provisions are equally unenforceable.[2]

Indeed, to the extent Congress was particularly concerned about mandatory arbitration, it is *Defendants'* interpretation that vindicates that differential focus. Under a proper reading of Sections 987(e)(3) and 987(f)(4), mandatory arbitration agreements cannot be enforced and may subject creditors to other penalties, whereas optional agreements may be enforced, consistent with the borrower's choice not to opt out of them. Revell cites a Department of Defense ("DoD") report that urged Congress to "outlaw 'mandatory arbitration clauses,' common among payday lenders, since they 'eliminate[d] a borrower['s] right to sue for abusive lending practices.'" Br. 24 n.3 (quoting *Report On Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* 14 (Aug. 9, 2006), https://perma.cc/NAC5-D97H ("DoD Report")); *see also* 152 Cong. Rec. H8061, H8415 (daily ed. Sept. 29, 2006) (explaining that the intent behind the MLA's arbitration provisions was to limit "*mandatory* waiver of a borrower's right to legal

---

[2] Revell suggests that Defendants' interpretation would "open a loophole," because "a covered borrower pleading claims under every MLA section except § 987(e)(3) could be compelled to arbitration simply because the provision included an opt-out." Br. 23 (citation omitted). But if the provision included an opt-out, then the borrower could not plead a claim under Section 987(e)(3) at all, because Section 987(e)(3) prohibits only mandatory arbitration. And if the borrower tried to bring a claim under Section 987(e)(3) regardless, the creditor could compel arbitration on the ground that the agreement was optional. There is, accordingly, no loophole to close.

recourse" (emphasis added)). Unlike mandatory arbitration clauses, though, an optional agreement does not eliminate a borrower's right to sue, because the borrower can bring his claims in court if he opts out.

Revell also downplays the MLA's structure, arguing that the titles of Section 987(e) ("Limitations") and Section 987(f) ("Penalties and Remedies") are irrelevant because "Section 987(f)(4)'s text is clear," and "[t]here is no ambiguity for the title to resolve." Br. 26. "Whether a statutory term is unambiguous," however, "does not turn solely on dictionary definitions of its component words." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion). Rather, "the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used." *Id.* (citation and alterations omitted). And here, the context in which the language of Section 987(f)(4) is used—as a penalty for the prohibition in Section 987(e)(3)—makes clear that the provision restricts enforcement of only mandatory arbitration provisions.

Finally, Revell contends (at 26) that "§ 987(f)'s title is underinclusive," because "[i]n addition to penalties and remedies, the section includes jurisdiction and venue provisions." It is unremarkable, though, for a penalty provision to specify the venue in which that penalty can be sought. *See, e.g.*, 42 U.S.C. § 7413(b).

Section 987(f)'s inclusion of jurisdiction and venue thus does not change that it is a penalty provision.

## II. Defendants' Cash Advances Are Not Credit.

Even if the MLA applied to optional arbitration clauses, it would preclude arbitration only of "dispute[s] involving the extension of consumer credit." 10 U.S.C. § 987(f)(4). As Defendants explained in their opening brief (at 23-34), the advances at issue here are not "credit" because users have no legal obligation to repay them and therefore do not incur debt. Revell suggests (at 27-47) that users have a *moral* obligation to repay the cash advances, and that the advances therefore involve an extension of credit even though they give rise to no legally enforceable debt. That argument is wrong in multiple respects.

### A. Debt Requires a Legal Obligation to Repay.

Revell concedes that a "debt" requires an obligation to repay. *See* Br. 28-29. And he appears to accept (as he must) that Defendants "ha[ve] no legal or contractual claim against [him] based on a failure to repay an Advance." ER-99. Unable to point to any legal obligation to repay that could give rise to a "debt" here, Revell thus argues that debt may also arise from a "moral duty," whether "imposed by law, contract, promise, social relations, courtesy, kindness, or morality." Br. 29 (quoting *Obligation*, Black's Law Dictionary (12th ed. 2024)). According to Revell, cash advances are obligations under that more capacious definition.

Revell is incorrect. For purposes of the MLA and related statutes, a debt requires a legal obligation to pay. While it may be common to speak colloquially of debts that arise from perceived moral obligations (such as a "debt of gratitude"), that is not the sense in which "debt" is ordinarily used in financial legislation. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012) ("[W]hen the law is the subject, ordinary legal meaning is to be expected, which often differs from common meaning."). In providing that a discharge under Chapter 7 of the Bankruptcy Code "discharges the debtor from all debts that arose before the date of the order for relief," 11 U.S.C. § 727(b), for example, Congress did not intend to free debtors from all moral obligations they might feel toward their friends or family. Similarly, while the Internal Revenue Code defines gross income to include any "discharge of indebtedness," 26 U.S.C. § 61(a)(11), a tax preparer need not ask whether her client received moral forgiveness in the preceding calendar year. Revell offers no reason to conclude that the term "debt," as used in the MLA's implementing regulations, should be interpreted more broadly to include amounts that a person feels a moral or social obligation to repay even in the absence of any legal obligation to do so.[3]

[3] Revell suggests (at 40) that Defendants have "fail[ed] to define" the word "obligation." The question before the Court, though, is the meaning of "debt." In any event, the relevant definition of "obligation" favors Defendants. *See Obligation*, Black's Law Dictionary ("A formal, binding agreement or acknowledgment of a

Indeed, that references to "debt" in federal or state law concern legal obligations, rather than moral or social ones, is well established. The Supreme Court long ago explained that "[a]ny one who is under no legal obligation or liability to pay [a] debt is a stranger [to the debt], and, if he pays the debt, a mere volunteer." *Aetna Life Ins. Co. v. Town of Middleport*, 124 U.S. 534, 551 (1888) (citation omitted); *see also United States v. Fort Scott*, 99 U.S. 152, 158 (1879) (bonds issued by city were "debts," because city was "under a statutory and legal obligation to provide for" them). Decisions from other courts likewise confirm that a debt, for purposes of the law, is a legal obligation. *See, e.g.*, *Cent. Freight Lines, Inc. v. Amazon Fulfillment Servs.*, 861 F. App'x 154, 158 (9th Cir. 2021) ("A debtor violates its legal duty if it fails to pay a debt when due . . . ." (citation and alteration omitted)); *American Textile Mfrs. Inst., Inc. v. Ltd., Inc.*, 190 F.3d 729, 736 (6th Cir. 1999) ("An obligation or debt may exist by reason of a judgment as well as an express contract, *in either case there being a legal duty* on the part of the one bound to comply with the promise." (emphasis added) (citation omitted)).

Interpreting "debt," as Revell does, to encompass moral obligations not only conflicts with more than a century of decisions interpreting related statutes but also is unworkable for businesses trying to comply with state and federal law. Creditors'

liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract.").

duty to screen for military status under the MLA, for example, would turn on whether a borrower subjectively believed that he had a moral obligation to repay. So too would a creditor's duty to provide disclosures under the Truth in Lending Act ("TILA"), which is likewise triggered by the extension of consumer credit. *See* 15 U.S.C. § 1602(g); 12 C.F.R. § 1026.2(a)(12). As courts have recognized, though, it is not "consumers' expectations regarding the nature of a financial service" that determine whether that service is credit; it is "the actual terms or operation of that service." *CFPB v. Snap Fin. LLC*, No. 2:23-cv-462, 2024 WL 3625007, at *9 (D. Utah Aug. 1, 2024); *see also id.* ("[R]egardless of what consumers subjectively believed, Snap was not offering credit.")

Seeking to avoid those implausible results, Revell insists that his interpretation of debt is "not predicated on anyone's individual, subjective beliefs," but rather is "based on objective factors." Br. 45 n.15 (internal quotation marks omitted). He fails to explain, however, what those objective moral factors are or how courts should apply them. If two identically situated customers disagree about whether they have a moral obligation to repay, is a company required to make disclosures only to the customer with the more demanding conscience? If not, how should a court determine which customer's view is correct?

History and precedent provide Revell no help: Aside from recent district court EWA litigation, Revell has not identified a single case interpreting "debt" in a statute

or regulation to encompass legally unenforceable moral obligations. There are thus no longstanding interpretive norms that courts could look to in determining which moral obligations do or do not count. Nor is there any background understanding that Congress could have intended to incorporate in passing the MLA.

Instead, Revell offers a series of arguments that assume his conclusion regarding the nature of debt. Such circular reasoning cannot support his position.

To begin, Revell argues that certain statements in Defendants' terms of service "support a mutual understanding that customers must repay," Br. 30 (citation omitted), and asserts that a "cash advance provider's reference to 'due date' 'connote[s] a sum owed or owing as a debt,'" *id.* (quoting *Feeman v. Bridge It, Inc.*, No. 25-cv-3806, 2026 WL 880508, at *8 (S.D.N.Y. Mar. 30, 2026)). But those same terms of service expressly provide that Defendants "ha[ve] no legal or contractual claim against you based on a failure to repay an Advance." ER-99. The only "mutual understanding" the terms of service support, then, is that customers are *not* required to repay advances, and that advances therefore do not give rise to debt.

Revell also contends (at 30-31) that the Fair Debt Collection Practices Act ("FDCPA") defines debt in terms of an obligation to repay. But that point favors Revell only if "obligation" includes non-legal obligations. And again, Revell does not explain why it does: He suggests (at 31 n.9) that "[t]he FDCPA . . . does not limit the expansive word 'obligation' to only the subset of obligations enforceable

in court or through traditional debt collection methods." But as discussed, the law has long equated debt and legal obligation, and Revell offers no reason to think the FDCPA departs from that understanding.

Similarly, Revell asserts (at 31-33) that commentary by the Federal Reserve Board ("FRB") on Regulation Z supports his position. Like the district court, he reads that commentary to classify all cash advances as credit, regardless of whether the consumer has a legal obligation to repay. But as Revell acknowledges, the commentary was focused on transactions that involved credit (and debt) under "the existing statutory and regulatory definition." Br. 32 (quoting 65 Fed. Reg. 17129, 17130 (Mar. 31, 2000)). It was not speaking to products that create no "debt" under the traditional legal understanding of that term. And because (as Defendants have already explained) the legal understanding of "debt" has long required a legally binding obligation to repay, the commentary cannot be read as taking the position that cash advances qualify as credit even where the borrower has no such obligation.[4]

Revell invokes a 2007 DoD rule that defined "payday loans" as a type of "credit" that included products for which "the covered borrower receives funds and contemporaneously authorizes the creditor to initiate a debit or debits to the

[4] Revell later refers back to the FRB's commentary, arguing that the agency "found a materially identical transaction and repayment procedure reflects an agreement to defer payment of a debt." Br. 43 (internal quotation marks, citation, and alteration omitted). That argument fails for the same reasons.

borrower's deposit account." Br. 34 (quoting 72 Fed. Reg. 50580, 50581, 50585-86 (Aug. 31, 2007)). And he cites a 2015 DoD rule stating that "'most, if not all, "deposit advance" products' would be considered credit." *Id.* (quoting 80 Fed. Reg. 43560, 43561, 43579-80 (July 22, 2015)). Revell appears to interpret those rules as supporting the position that cash advances can qualify as credit even absent a legal obligation to repay. Neither says that. Rather, by describing "payday loans" and "deposit advance" products as forms of "credit"—a term defined in 2007 and 2015 as a right to "defer payment of debt or to incur debt and defer its payment," 12 C.F.R. § 226.2(a)(14) (2007); 80 Fed. Reg. at 43607—the DoD made clear that its discussion was focused on products that *do* impose such an obligation.

**B. The CFPB's Advisory Opinion Supports Defendants.**

If there were any doubt, the CFPB's recent Advisory Opinion makes clear that Defendants' advances are not credit. As Defendants previously explained, the Advisory Opinion's interpretation of "credit," like the interpretation Defendants have advanced here, entails a legal obligation to repay. Opening Br. 27-28. Revell pushes back on several grounds, none of which is persuasive.

*First*, Revell cites *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), for the proposition that the Advisory Opinion "cannot supplant this Court's independent judgment." Br. 46. But while the Court must decide the question for

itself, the CFPB's expert views provide powerful support for interpreting "credit" to require a legal obligation to repay.[5]

*Second*, Revell contends that "the Advisory Opinion addresses dispositively different products" than those at issue. Br. 46. While the Advisory Opinion dealt with a particular subset of EWA products, however, its reasoning applies here as well. The CFPB described the EWA products at issue as "lack[ing] typical substantive indicia of credit," because providers "reserve no recourse" and "cannot engage in debt collection, report to consumer reporting agencies, or sell or place the transaction as a debt with any third party." 90 Fed. Reg. 60069, 60072 (Dec. 23, 2025). The same is true with respect to Defendants' advances, and the Advisory Opinion thus supports the conclusion that those advances are not credit.

*Third*, Revell argues that the Advisory Opinion supports his position because the CFPB said "the defining element of 'credit' is a consumer's repayment—at some point in the future—of the amount owed." Br. 47 (citing 90 Fed. Reg. at 60072). That argument again presumes that the term "owed" encompasses non-legal obligations, which is mistaken for the reasons discussed above.

---

[5] Revell's recognition that this Court must exercise its "independent judgment," Br. 46, is ironic given his passing claim elsewhere that the Court should defer to the DoD and FRB regulations addressed above, *see* Br. 31 n.10. As already discussed, those regulations do not support Revell's position. *See* pp. 11-12, *supra*. But even if they did, Revell fails to explain how this Court could defer to them given the more recent CFPB guidance.

### C. Revell's Remaining Arguments Fail.

Revell makes several other attempts to explain why cash advances should be treated as credit, but those efforts fail as well.

Revell argues (at 36) that "a debt that might later be avoided or forgiven under some unlikely contingency is still a debt." But Defendants' customers did not incur a debt to begin with. Revell relatedly asserts (at 37) that "whether a cash-advance product meets the 'credit' definition does not hinge on whether a creditor voluntarily waives some collection options." The collection option that is the sine qua non of credit, though, is the ability to seek legal relief for a failure to repay. Defendants never had that option at all.

Revell suggests (at 42) that the Supreme Court's decision in *Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552 (1990), stands for the proposition that a debt need not be legally enforceable because the restitution obligations at issue there were not enforceable "in civil proceedings." The restitution obligations were conditions of probation, though, and the State could enforce them by instituting probation violation proceedings, with the penalty being "revocation of probation and incarceration." *Id.* at 559. The State accordingly had a right to enforce the obligations in court—indeed, it could do so through criminal proceedings. As *Davenport* recognized, "the right created by such an order [of restitution] made as a condition of probation is in some sense greater than the right

conferred by an ordinary civil obligation, because it is secured by the debtor's freedom rather than his property." *Id.* at 559-60.

Revell also contends (at 37-38) that Defendants have "recourse" against their customers because Defendants can prevent users who do not make payment from accessing new advances in the future. The fact that a customer must make a payment to receive an *additional* advance, however, does not mean the customer owes a debt for the original advance, as to which there is no recourse. It simply shows that the provider wishes to limit its financial losses given that the advances are uncollectible.

Revell next argues that Defendants' ability to debit users' accounts constitutes a "right to enforce [borrowers'] obligations," citing *Davenport* for the proposition that a debt need not be enforceable in court. Br. 41-42. As discussed, *Davenport* does not stand for that proposition. *See* pp. 14-15, *supra*. And the other cases Revell cites (at 42-43 & n.14) do not help him either.[6]

---

[6] Revell cites *Thompson v. Commissioner*, 235 F.2d 599 (9th Cir. 1956), as holding that "[a] debt is 'that which is due from one person to another.'" Br. 42-43 (quoting *Thompson*, 235 F.2d at 601). That helps Revell only if "due" means "legally or morally due," which Revell fails to establish for the reasons above. Revell also cites *Perry v. United States*, 294 U.S. 330 (1935), with no elaboration. Br. 43. As Defendants explained in their opening brief (at 27), *Perry* equated the words "public debt" with "public obligations," thereby supporting Defendants again. 294 U.S. at 354. Revell tries (at 43 n.14) to distinguish *Gilman v. Commissioner of Internal Revenue*, 53 F.2d 47 (8th Cir. 1931). But as even Revell concedes, *Gilman* clearly stated that "[t]he term 'indebtedness' as used in the [Revenue Act of 1921] implies an unconditional obligation to pay." *Id.* at 50.

Finally, Revell invokes policy concerns and urges this Court to "liberally construe" the MLA. Br. 38 (citation omitted). This Court's role, though, is to read the applicable statute and regulations according to their terms. *See Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995) ("the proposition that the statute at hand should be liberally construed to achieve its purposes" is "that last redoubt of losing causes"). And as discussed, the MLA's terms point to a single conclusion: cash advances are not credit because consumers have no legal obligation to repay. That conclusion is consistent with the MLA's purposes, because there is no risk that borrowers will be trapped in a debt cycle if they can walk away after obtaining an advance. *See* Opening Br. 32.

On that last point, Revell argues (at 44) that borrowers cannot disconnect their accounts, because the terms of service provide that cancellation requests made via email must be made at least three business days before a scheduled debit. *See* ER-49; ER-101. But Revell never alleges that he was required to repay an advance fewer than three days after it was authorized.[7] Nor does he allege that he was unable to disconnect his account via other means, which CFPB guidance makes clear were available to him. *See* CFPB, *How Do I Stop Automatic Payments from My Bank*

[7] Revell does allege that he repaid one advance fewer than three days after *accepting* it. *See* Br. 44 (citing ER-49, ¶ 98). But Revell does not dispute that the advance was authorized several days earlier, and that he could have accepted the funds and requested that his account be disconnected more than three days before the scheduled debit.

*Account?*, https://perma.cc/Z7P9-LFER. For example, Revell could have directed his bank to close his account. Or he could have asked his bank to deny Defendants access. At bottom, Defendants had no right or ability to stop Revell from avoiding a scheduled withdrawal.

Even if the Court were to consider policy arguments, then, those arguments weigh in favor of Defendants. Congress passed the MLA in response to concerns that "predatory lenders" were exerting "undue and coercive pressure on military borrowers," including though "threats of criminal prosecution," given that "[s]ome state laws treat [an] unpaid payday loan as a civil or criminal bad check." DoD Report 7, 21. Those pressures are entirely absent from products that lack any legal recourse. Indeed, Defendants' non-recourse cash advances are one of the few alternatives on the market that enable members of the military (and others) with short-term liquidity needs to *avoid* predatory lenders.

## III. Defendants Do Not Impose Finance Charges.

Even if Defendants' advances qualified as "credit," they still would not be covered by the MLA because they are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). Contrary to Revell's argument (at 48-59), the fees that some users choose to pay for expedited delivery are not finance charges because: (1) they are not "imposed"; (2) they are not "an incident to or a condition of the extension of credit"; and (3) they are "of a type payable in a comparable cash transaction." 12

C.F.R. § 1026.4(a). Furthermore, Revell does not (and cannot) argue that cash advances are subject to a finance charge when users choose not to expedite delivery.

**A. Defendants Do Not "Impose" Expedite Fees.**

Beginning with whether expedite fees are "imposed," Revell argues (at 52) that imposed simply means "charged." For support, he cites a 1996 rulemaking in which the FRB took the position that certain voluntary debt cancellation fees were "imposed," despite being optional. *See* Br. 52 (quoting 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996)). Revell also cites (at 54) several state statutes, which, he argues, use the word "imposed" when describing optional expedite fees.

Those sources do not support Revell's position. The debt cancellation fees discussed by the FRB were a form of credit insurance that "alter[ed] the fundamental nature of the borrower's repayment obligation." 61 Fed. Reg. at 49239. Expedite fees, by contrast, do not alter repayment obligations; they just provide borrowers with earlier access to funds. As the CFPB recently explained, "in the normal course, fees for expedited delivery of earned wages . . . are not finance charges because they are not imposed directly or indirectly by the provider." 90 Fed. Reg. at 60074 (emphasis omitted). Rather, they "are triggered by the consumer's opting for expedited delivery." *Id.* at 60075.

The state statutes do not help Revell, either, because they describe expedite fees as "imposed" for the delivery itself, not "as an incident to or a condition of the

extension of credit." *See* Ark. Code Ann. § 23-52-202(7)(A) ("'Fee' means a charge imposed by a provider for delivery or expedited delivery of proceeds to a consumer"); Kan. Stat. Ann. § 9-2402(i) ("'Fee' means a fee imposed by a provider for delivery or expedited delivery of proceeds to a consumer"); S.C. Code Ann. § 39-5-820(7)(a) ("'Fee' shall include a: fee imposed by a provider for delivery or expedited delivery of proceeds to a consumer"); Utah Code Ann. § 13-78-101(4)(a) ("'Fee' means a charge the provider imposes on a consumer for . . . expedited delivery of funds"). A creditor "imposes" a fee *for expedited delivery* once a borrower has chosen that delivery option, because there is no way to receive expedited delivery without paying the fee. But the creditor has not "imposed" the fee "as an incident to or a condition of the extension of credit," because the borrower is not required to choose expedited delivery in the first place.

Revell separately argues that his reading of "imposed" is required to "give[] effect to the disjunctive: 'as an incident to *or* a condition of the extension of credit.'" Br. 52 (quoting 12 C.F.R. § 1026.4(a)). According to Revell, a fee is a "condition of the extension of credit" when it is mandatory, and "the creditor will not extend credit at all without the fee." *Id.* Because the "condition" language covers mandatory fees, he suggests, the "incident to" language must cover non-mandatory fees that "unlock optional features." *Id.* That purported distinction between

necessary conditions and optional incidents, however, has no basis in the MLA or its implementing regulations, and is inconsistent with governing precedent.

As the Supreme Court explained in *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232 (2004), the phrase "incident to" in TILA "implies some *necessary* connection" between a finance charge and an extension of credit, *id.* at 241. There can be no "necessary" connection where the purported finance charge is optional. Thus, although the terms "incident" and "condition" capture different relationships, both relationships involve necessity: A charge is a condition of the extension of credit if it is a prerequisite to that extension, and a charge is an incident if it follows necessarily from the extension. There is thus no need to read "imposed" as covering voluntary charges to "give[] effect to the disjunctive" between incident and condition.

### B. Expedite Fees Are Not "an Incident to or a Condition of the Extension of Credit."

Nor are expedite fees "an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). As Revell recognizes (at 48), the phrase "incident to" "implies some *necessary* connection" between a finance charge and an extension of credit. *See Pfennig*, 541 U.S. at 241. Because users can receive the same cash advance regardless of whether they pay an expedite fee, there is no necessary connection between the two, and the latter is not an incident to the former.

Revell argues that "[n]o one pays [the expedite] fee without taking a Cash Advance," and that "'[t]he fee exists only because the loan exists.'" Br. 48-49 (citation omitted). There are myriad fees, though, that exist only because of an extension of credit, and that are nevertheless excluded from the definition of "finance charge." *See, e.g.*, 12 C.F.R. § 1026.4(c)-(e) (listing examples). Furthermore, the Supreme Court has expressly rejected the argument that a fee must be classified as a finance charge simply because creditors "would not have imposed [it] had they not granted [a borrower's] request for additional credit." *Pfennig*, 541 U.S. at 239 (internal quotation marks and citation omitted).

Relatedly, Revell argues (at 50) that optional expedite fees must have a necessary connection to the extension of credit because, if they did not, "there would be no reason for Grant to tout the speed of its advances, and no one would pay for instant delivery." But some people pay for expedited delivery because it is a valuable bonus feature, while others choose to forgo it. There is a difference between being valuable and necessary.

Revell cites, once again, the 1996 FRB rulemaking for the proposition that optional fees can be finance charges. *See* Br. 49-50. But as explained above, *see* p. 18, *supra*, the debt cancellation fees the FRB was considering "alter[ed] the fundamental nature of the borrower's repayment obligation," 61 Fed. Reg. at 49239. And the CFPB has since explained that "in the normal course, fees for expedited

delivery of earned wages . . . are not finance charges." 90 Fed. Reg. at 60074 (emphasis omitted).

Finally, Revell cites cases interpreting the phrase "incidental to" in the context of the FDCPA. *See* Br. 51 (citing *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 377 n.2 (4th Cir. 2022); *Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1291 n.13 (11th Cir. 2025)). Courts have interpreted the relevant FDCPA provision, though, to apply to "any amount" charged, regardless of whether the charge is "incidental." *See Alexander*, 23 F.4th at 377 & n.2 (court did not need to decide whether fees were "incidental" because statute covered collection of "any amount"); *Glover*, 127 F.4th at 1288 ("any amount" not limited to amounts "incidental to the principal obligation" (citation omitted)). Those cases thus have no bearing on the proper interpretation of the MLA, which requires that finance charges be incidental.

Lacking precedent on his side, Revell tries to cast doubt on the CFPB's recent Advisory Opinion and the Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996)—both of which support Defendants. *See* Opening Br. 36-38. Revell's effort on each front is unsuccessful.

Beginning with the Advisory Opinion, Revell argues that the CFPB was incorrect in its "assumption that 'consumers can receive exactly the same service without paying the fee,'" Br. 54 (quoting 90 Fed. Reg. at 60075), because

Defendants "offer[] fast instant cash at your fingertips," and Defendants "charge[] an unavoidable fee for *that* feature," *id.* (internal quotation marks and citation omitted). That argument finds no support in the relevant statutory or regulatory text. The term "finance charge" is defined to include a fee that is imposed "as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). It is not defined to include a fee imposed "as an incident to or a condition of the extension of credit-with-a-particular-service." If it were, then every service fee a lender imposed could be a finance charge, because a borrower could always characterize the product at issue as a credit-with-a-particular-service product. So defined, the service fee would be mandatory with respect to that product.

The FRB reached the same conclusion two decades ago when it determined that expedite fees paid in connection with certain credit cards were not finance charges because the same services were available on a non-expedited basis if consumers chose not to pay the fees. *See* 68 Fed. Reg. 16185, 16186-87 (Apr. 3, 2003). Revell asserts that "[i]mmediate disbursement of funds . . . is not 'exactly the same service' as receiving those funds 3-5 days later." Br. 54-55 (citation omitted). But if he were right, the FRB would have been wrong, as customers who paid to receive their cards earlier would have had earlier access to credit.

Moving to *Veale*, Revell argues that the Eleventh Circuit's decision does not survive *Pfennig*. Specifically, he contends that *Pfennig* "clarified 'incident to'

requires only a 'connection' to credit," whereas *Veale* had held that "a fee must be 'required by' the lender to be 'incident to' credit." Br. 55 (quoting 541 U.S. at 241). But Revell misreads *Pfennig*, leaving out the Supreme Court's statement that the phrase "incident to" "implies some *necessary* connection" between a finance charge and an extension of credit. 541 U.S. at 241. There can be no "necessary connection" where the purported finance charge is optional.

Revell also tries to distinguish *Veale* on its facts, arguing (at 55-56) that the FedEx fee in that case was not a finance charge because it was not retained by the lender. But the regulation he cites was not in effect at the time *Veale* was decided and (for that obvious reason) was not relied upon by the court. *Compare* 12 C.F.R. § 226.4 (1996), *with* 12 C.F.R. § 1026.4(a)(1)(ii). Revell also argues that the FedEx fee in *Veale* "unlocked no loan feature." Br. 56. But it unlocked expedited mailing of loan documents and disbursement of a loan refinancing. Revell fails to explain why expedited delivery of cash advances "affect[s] the underlying [financing]," *id.*, while expedited mailing and disbursement does not.

### C. Expedite Fees Are "of a Type Payable in a Comparable Cash Transaction."

Even if expedite fees were "imposed," and even if they were "an incident to the extension of credit," they would not be finance charges because they are "of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). As Defendants explained in their opening brief (at 38-40), expedite fees are materially

identical to fees that banks and digital wallets charge in non-credit transactions to expedite settlement of checks and withdrawal of cash.

Revell contends (at 57) that this argument is "procedurally improper" because Defendants did not request judicial notice. But the fact that banks and digital wallets charge expedite fees is a legislative fact—*i.e.*, a fact "which ha[s] relevance to legal reasoning and the lawmaking process"—rather than an adjudicative fact—*i.e.*, one of "the facts of the particular case." Fed. R. Evid. 201 advisory committee's note to 1972 amendments. And "[j]udicial notice of legislative facts such as these is unnecessary." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010). In any event, a court "may take judicial notice on its own" if facts are "not subject to reasonable dispute." Fed. R. Evid. 201(b), (c)(1). Revell cannot reasonably dispute that consumers often pay expedite fees for cash transfers and withdrawals from banks and digital wallets, and this Court need not blind itself to that reality.

Revell also argues (at 58) that, in order to show that expedite fees are of a type payable in a comparable cash transaction, "Grant would have to show *it* imposes Instant Delivery Fees in non-credit transactions." That limitation, however, appears nowhere in Regulation Z. And such a limitation would make no sense, as it would mean that the same fee could be treated as a finance charge for creditors with only credit customers, while not being treated as a finance charge for creditors with both

credit and cash customers. Neither Congress nor the CFPB (nor the FRB before it) could have intended that counterintuitive result.

Finally, Revell argues (at 58-59) that the comparable-cash-transaction paradigm does not apply *at all* to cash advances. But that argument is mistaken as well. An expedite fee that a customer pays to access his own money is a comparable cash transaction to an expedite fee that a customer pays to access money from a creditor, because both transactions simply consist of payment for the rapid transfer of funds. Defendants' expedite fees therefore are not finance charges, and Defendants' cash advances are not consumer credit.

### D. It Is Undisputed That Cash Advances Are Not Consumer Credit When Users Choose Not to Expedite Delivery.

One last point bears mentioning: Even if Revell were correct that expedite fees are finance charges, cash advances still would not be consumer credit for users who choose not to expedite delivery, because those users pay no such fees. The MLA accordingly would not apply to those transactions. It is implausible, though, that Congress intended for the MLA's protections to apply only when a consumer chooses to incur an optional expense for a bonus feature that the provider does not require. Not only would such a scheme fail to advance any coherent objective, but it also would be impractical to apply, as creditors would have no way of knowing ex ante which borrowers were subject to the MLA's protections. The arguments above

provide a sufficient basis to reject Revell's claim that expedite fees are finance charges, but the improbable consequences of his position supply another reason still.

## IV. At Minimum, Revell's TILA and GPLA Claims Are Arbitrable.

At the very least, Revell cannot avoid arbitration of his claims under TILA and the Georgia Payday Loan Act ("GPLA"), as neither of those statutes prohibits arbitration.

Revell argues that the MLA precludes arbitration of his TILA and GPLA claims because "those claims are disputes involving the extension of consumer credit to a covered member." Br. 59 (internal quotation marks and alteration omitted). But the MLA's prohibition on arbitration of "any dispute involving the extension of consumer credit," 10 U.S.C. § 987(f)(4), is best read to apply to claims brought under the MLA, which imposes limitations on the "[t]erms of consumer credit extended to [service]members and dependents," 10 U.S.C. § 987.

Reading Section 987(f)(4) to prohibit arbitration of any dispute that relates in any manner to the extension of consumer credit would lead to absurd results. Indeed, under Revell's proposed interpretation, if he brought only his TILA and GPLA claims—or even only his GPLA claim—the MLA would preclude arbitration, even though Revell alleged no violation of the MLA.

Revell's reading would also pose difficult line-drawing problems for courts trying to determine whether a "dispute involv[es] the extension of consumer credit,"

10 U.S.C. § 987(f)(4), such that arbitration is precluded. Courts would need to decide, for example, whether a state-law products liability claim "involv[es] the extension of consumer credit" whenever the product in question was purchased with financing. So too with claims for breach of warranty or deceptive advertising. Yet Revell offers no standard by which courts could decide which claims are covered and which ae not. Defendants' position, on the other hand, avoids those problems by recognizing that the MLA's prohibition on arbitration applies only to claims under the MLA itself.

As Defendants noted in their opening brief (at 41-42), the Fourth Circuit's decision in *Espin v. Citibank, N.A.*, 126 F.4th 1010 (4th Cir. 2025), adopted that more limited (and administrable) understanding. Revell contends (at 60) that "[t]he *Espin* court did not confront whether the MLA prohibits compelling arbitration of claims under other laws concerning consumer credit." But by compelling arbitration of the plaintiffs' Servicemembers Civil Relief Act ("SCRA") claims while remanding their MLA claims to determine whether those claims were arbitrable, the court necessarily held that the MLA does not prohibit compelling arbitration of claims under other laws: If *Espin* had agreed with Revell that the MLA forecloses arbitration of non-MLA claims involving the extension of consumer credit, the court would have treated the SCRA claims identically to the MLA claims at issue there, rather than sending the SCRA claims to arbitration.

## CONCLUSION

This Court should reverse the decision below and remand with instructions to order Revell to arbitrate his claims.

Dated: June 22, 2026

Respectfully submitted,

*/s/ Matthew P. Previn*

Matthew P. Previn
Ben Gifford
Margaret Shields
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Benjamin W. Snyder
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
(202) 551-1700

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7035

I am the attorney or self-represented party.

**This brief contains** 6,966 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ________.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Matthew P. Previn **Date** June 22, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 22, 2026, I caused the foregoing brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit via the ACMS system and that service on all counsel of record will be accomplished by the ACMS system.

*/s/ Matthew P. Previn*
Matthew P. Previn